NO. 13-13444

DISTRICT COURT CASE NO. 1:10-CR-0097

---

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

JEAN-DANIEL PERKINS,

APPELLANT

vs.

UNITED STATES OF AMERICA,

APPELLEE.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

APPELLANT'S OPENING BRIEF


SARALIENE SMITH DURRETT
2002 SUMMIT BLVD.
SUITE 300
ATLANTA, GA 30319
(404) 433-0855

ATTORNEY FOR APPELLANT
JEAN-DANIEL PERKINS

## CERTIFICATE OF INTERESTED PERSONS

In compliance with 11th Cir. R. 26.1-3, Appellant Jean-Daniel Perkins, by and through his attorney of record, hereby asserts that the interested persons in this case are as follows:

Allen, Walter

American Express (AXP)

Carnes, Honorable Julie E., Judge

Cooper & Company, General Contractors, Inc.

Cooper, Gail

Cooper, Steve

Durrett, Saraliene Smith, Defense Attorney

Evans, Lisa

Ferry, Hayes, and Allen Designers, Inc.

Goss, Dahil Dueno, AUSA

Jones, Derek, Defense attorney

McBurney, Robert, Former AUSA

Oldham, Nicholas, Former AUSA

Perkins, Jean-Daniel, a/k/a Daniel Mathews, a/k/a LJ

Perkins Erskine, Kurt R., AUSA

Sachs, Gerald S., Former AUSA

**CERTIFICATE OF INTERESTED PERSONS (continued)**

Sommerfeld, Lawrence R., AUSA

Spencer, Gary, Defense Attorney

Suntrust Bank (STI)

The Georgia Tech Foundation

Viscomi, George Jeffrey, AUSA

Yates, Sally Quillian, United States Attorney

## **STATEMENT REGARDING ORAL ARGUMENT**

Counsel submits that several of the issues presented are novel issues in this Court.  Therefore, the Court may benefit from oral argument in this case. Because of counsel's familiarity with the record, oral argument is requested.

# <u>TABLE OF CONTENTS</u>

Table of Authorities……………………………………..…………………vii

Statement of Jurisdiction………………………………..……………………..x

Statement of the Issues…………………………………………………...….1

Statement of the Case…………………………………………..………………2

Summary of the Argument……………………………..…..……………18

Argument………………………………………………………...…..………19

I.    THE DISTRICT COURT ERRED IN FORCING APPOINTED COUNSEL ON MR. PERKINS……………………………..………19

II.    THE DISTRICT COURT ERRED IN DENYING SEVERAL MOTIONS TO SUPPRESS EVIDENCE…………………………....22

III.    THE DISTRICT COURT ERRED IN DENYING MR. PERKINS' MOTION TO RECUSE……………………………..………………30

IV.    THE DISTRICT COURT ERRED IN HOLDING A TRIAL IN MR. PERKINS' ABSENCE……………………………..………………..34

V.    THE DISTRICT COURT VIOLATED MR. PERKINS' RIGHT TO A PUBLIC TRIAL……………………………………………………..41

VI.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO CONVICT MR. PERKINS…...……………………43

VII.    THE DISTRICT COURT ERRED IN SENTENCING MR PERKINS TO A TERM OF 360 MONTHS………..………………………..48

VIII.    THE DISTRICT COURT ERRED IN NOT ORDERING A COMPETENCY HEARING………………………...……………52

Conclusion …..…………...……………..……………………………..58

## <u>TABLE OF CONTENTS (continued)</u>

Certificate of Compliance ……………..………..………………………59

Certificate of Service…………………………………………….…………60

## TABLE OF AUTHORITIES

### U.S. SUPREME COURT

*Berger v. United States,* 255 U.S. 22 (1921)…...…………………………..31

*Bishop v. United States*, 350 U.S. 961 (1956)……..…………………….57

*Bracy v. Gramley,* 520 U.S. 899 (1997)……….…..……………………30

*Bumper v. State of North Carolina*, 391 U.S. 543 (1968)…...…………...24

*Chapman v. California,* 386 U.S. 18 (1967)………………………………40

*Crosby v. United States,* 566 U.S. 255 (1993)……………………………..34

*Drope v. Missouri,* 420 U.S. 162, 181 (1975)…………………...52, 53, 57

*Dusky v. United States,* 362 U.S. 402 (1960)……………………………52

*Edwards v. Balisok,* 520 U.S. 641 (1997)…………………………………30

*Faretta v. California*, 422 U.S. 806 (1975)…………………...…19, 20, 35

*Figueroa v. United States,* 556 U.S. 646 (2009)…………………………..46

*Franks v. Delaware,* 438 U.S. 154 (1978)……..…………………………29

*United States v. Gonzalez-Lopez*, 548 U. S. 140 (2006)…………….....19, 20

*Illinois v. Gates*, 462 U.S. 213 (1983)…………………………...………23

*Kentucky v. Stincer,* 482 U.S. 730 (1987)…………………………………40

*United States v. Leon*, 468 897 (1984)…………………….…………………23

*United States v. Marcus*, 130 S. Ct. 2159 (2010)…………………………..41

*Neil v. Biggers*, 409 U.S. 188 (1972)……………………….…....26, 28

*In re Oliver*, 333 U.S. 257 (1948)…………………………………………41

*Pate v. Robinson*, 383 U.S. 375 (1966)……………………….……52, 56

*Powell v. Alabama*, 287 U.S. 45 (1932)………………………………...…19

*Waller v. Georgia*, 467 U.S. 39 (1984)……..…………………...………41

*Wheat* v. *United States,* 486 U. S. 153 (1988)……………………………19

*In re Winship*, 397 U.S. 358 (1970)………………………………………43

### ELEVENTH CIRCUIT

*United States v. Berger*, 375 F.3d 1223 (11th Cir. 2004)…………………30

*United States v. Boffil-Rivera*, 607 F.3d 736 (11th Cir. 2010)……………..43

*United States v. Bradford*, 237 F.3d 1306 (11th Cir. 2001)…………….34, 35

*Christo v. Padgett*, 223 F.3d 1324 (11th Cir. 2000)………………………31

*United States v. Curbelo*, 726 F.3d 1260 (11th Cir. 2013)…….…………34

*United States v. Doe*, 661 F.3d 550 (11th Cir. 2011)………………....47, 48

*United States v. Dortch*, 696 F.3d 1104 (11th Cir. 2012)…………………35

*United States v. Douglas*, 489 F.3d 1117 (11th Cir. 2007)………………...22

*In re Evergreen Sec., Ltd.,* 570 F.3d 1257 (11th Cir.2009)………………...32

## TABLE OF AUTHORITIES (continued)

### ELEVENTH CIRCUIT

*United States v. Foree*, 43 F.3d 1572 (11th Cir. 1995)……………...…………23

*United States v. Fortenberry*, 971 F.2d 717 (11th Cir.1992)……………...22

*Jones v. Kemp*, 794 F.2d 1536 (11th Cir.1986)………………….………29

*Judd v. Haley*, 250 F.3d 1308 (11th Cir. 2001)………………….…………42

*United States v. Johnson*, No. 07-14216, opinion filed on October 3, 2008
(11th Cir. 2008)………………………………………………………………24

*United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989)………..……….33

*United States v. Mitchell*, 565 F. 3d 1347 (11th Cir. 2009)………………23

*United States v. Nunez,* 455 F.3d 1223 (11th Cir.2006)…………...…………22

*United States v. Patti,* 337 F.3d 1317 (11th Cir.2003)…………………….32

*United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008)…………………….48

*United States v. Smith*, 231 F.3d 800 (11th Cir. 2000)……………..………48

### OTHER CIRCUITS

*United States v. Ayala*, 289 F.3d 16 (1st Cir. 2002)………………………..45

*Butler v. United States,* 317 F.2d 249 (8th Cir. 1963)……………......45, 46

*United States v. Danzey*, 594 F.2d 905 (2d Cir. 1979)…………………….43

*Fontanez,* 878 F.2d 33 (2nd Cir. 1989)……………………………….…….39

*United States v. Furst*, 886 F.2d 558 (3rd Cir. 1989)………………....…31

*James v. Singletary*, 957 F.2d 1562 (11th Cir.1992)………....…52, 53, 54, 57

*United States v. Johnson*, 427 F.2d 957, 961 (5th Cir. 1970)……………...43

*Medina v. Singletary*, 59 F.3d 1095 (11th Cir. 1995)…………………..53

*United States v. Musa*, 220 F.3d 1096 (9th Cir. 2000)…………………..21

*United States v. Nickels*, 324 F.3d 1250 (11th Cir. 2003)…………………52

*United States v. Torres-Rodriguez*, 930 F.2d 1375 (9th Cir. 1991)………..21

*United States v. Weed*, 689 F.2d 752 (7th Cir. 1982)………………….…45, 46

*United States v. Wilford*, 493 F.2d 730 (3d Cir. 1974)……………......…43

### UNITED STATES SENTENCING GUIDELINES/STATUTES/RULES

18 U.S.C. § 1028A………….………………………………………46, 50

18 U.S.C. § 3553……………..…………………………………49, 51

18 U.S.C. § 4241……………………………………….……………53

18 U.S.C. § 4244………………………………..………………54

28 U.S.C. § 144………………………………………………30-32

**TABLE OF AUTHORITIES (continued)**

**UNITED STATES SENTENCING GUIDELINES/STATUTES/RULES**

28 U.S.C. §455……………………………………….…….30, 32, 34

U.S.S.G § 2B1.6……………………………………………………50

U.S.S.G § 3C1.1(a))…………………………………………48, 49

Fed. R. Crim. P. 33(a)……………………………..…………………25

Fed. R. Crim. P. 43(c)…………………………………………..…..35

Northern District of Georgia's Local Rule 7.1……………………..23

Appendix C, Northern District of Georgia Local Rules,

App. C-8, ¶ 5(e)(2)…………………………………………………35

## STATEMENT OF JURISDICTION

Mr. Perkins was convicted after a jury trial in the United States District Court for the Northern District of Georgia.  Doc. 178.  His sentence became final on July 23, 2013.  Doc. 313.   Counsel timely filed his notice of appeal pursuant to FRAP 4 on July 29, 2013.  Doc. 314.  This Court has jurisdiction over a jury verdict and a district court's final sentencing decision pursuant to 28 U.S.C. § 1291.

## STATMENT OF THE ISSUES

I.    THE DISTRICT COURT ERRED IN FORCING APPOINTED COUNSEL ON MR. PERKINS.

II.   THE DISTRICT COURT ERRED IN DENYING SEVERAL MOTIONS TO SUPPRESS EVIDENCE.

III.  THE DISTRICT COURT ERRED IN DENYING MR. PERKINS' MOTION TO RECUSE.

IV.   THE DISTRICT COURT ERRED IN HOLDING A TRIAL IN MR. PERKINS' ABSENCE.

V.    THE DISTRICT COURT VIOLATED MR. PERKINS' RIGHT TO A PUBLIC TRIAL.

VI.   THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO CONVICT MR. PERKINS.

VII.  THE DISTRICT COURT ERRED IN SENTENCING MR PERKINS TO A TERM OF 360 MONTHS.

VIII. THE DISTRICT COURT ERRED IN NOT ORDERING A COMPETENCY HEARING.

# STATEMENT OF THE CASE

## *Proceedings Below*

A superseding indictment charging Mr. Perkins with two counts of Bank Fraud Conspiracy, thirty counts of Bank Fraud, four counts of Access Device Fraud, and one count of Aggravated Identity Theft was filed on June 8, 2010. Doc. 35. Mr. Perkins was convicted on all counts after a jury trial. Doc. 178. The court denied appointed counsel's motion for new trial in which he argued that the court erred in conducting the trial without the defendant ever being present. Doc. 190. A sentencing hearing was held on February 25, 2013 (doc. 302), during which the court ordered a provisional sentence of 360 months. Doc. 303; Doc. 326. This sentence became final on July 23, 2013. Doc. 313. Appointed counsel timely filed a notice of appeal on July 29, 2013. Doc. 314.

Mr. Perkins is currently incarcerated.

## *Statement of Facts*

The indictment alleges that Mr. Perkins conspired with others to defraud American Express, Suntrust Bank, and others by setting up fraudulent merchant accounts, obtaining credit card and account holder information for existing accounts, accessing funds in existing accounts, and making fraudulent charges.[1] Doc. 35 at 4.

---

[1]    The evidence at presented at trial was consistent with the allegations in

2

It further alleges that Mr. Perkins and others aided and abetted each other in producing, using, and trafficking in counterfeit access devices. Doc. 35 at 15. Finally, the indictment alleges that Mr. Perkins used the name and social security number of another person with initials LTE without lawful authority. Doc. 35 at 17.

Counsel was appointed to represent Mr. Perkins on March 1, 2010. Doc. 335. Six months later, the court granted counsel Derek Jones' motion to withdraw. Doc. 61 at 1; Doc. 65; Doc. 336. Gary Spencer was then appointed to represent Mr. Perkins. Doc. 66. On January 24, 2011, Mr. Perkins (*pro se*) filed a document entitled "Revocation of Power of Attorney," in which he revoked, canceled, and annulled "all Powers of Attorney, in fact or otherwise, signed by me . . . with, to and/or for R. Gary Spencer." Doc. 91.

Mr. Spencer, filed his first motion to withdraw on May 18, 2011, noting that:

> Mr. Perkins has made it clear that he does not want the undersigned as counsel. Moreover, upon information and belief, Mr. Perkins never wanted counsel appointed to him under the Criminal Justice Act. In addition, there are conflicts that are insurmountable relating to strategy in the upcoming trial.

Doc. 139 at 1. At a hearing on the motion, Mr. Perkins stated:

> Any representation, any of your esquires, attorneys or barristers or counselors or whatever you want to call it, I have never accepted the

---

the superseding indictment. Counsel asserts that very few issues related to the content of testimony at trial are relevant on appeal.

> benefits as they are under the Criminal Justice Act of 1964. *I am not an indigent, a ward*. I don't accept anything from this court, period....

Doc. 151 at 2-3 (emphasis added).

After much back and forth, the court asked Mr. Perkins, "Do you want to waive or give up your right to effective assistance of counsel?" Mr. Perkins responded:

> For and on the record I do not accept any of your rights and I want to know, I ask, for and on the record I'm under duress, okay, and I ask, and I ask [*sic*], how can I waive something that I have never accepted and that does not apply to me?

Doc. 151 at 6.

Determining that Mr. Perkins did not provide a responsive answer, the court decided that Mr. Spencer should stay on as counsel. Doc. 151 at 6. Mr. Perkins immediately stated, "I reject your offer." Doc. 151 at 6.

Prior to trial, the court held another hearing on the issue of appointed counsel, this time at the government's request. Doc. 148; Doc. 157. By this time, attorney Spencer had filed his second motion to withdraw, complete with an affidavit from Mr. Perkins asking that Mr. Spencer "cease and desist all action for and on behalf of Jean-Daniel Perkins…." Doc. 150; 151-1 at 3. During a hearing on these motions, the district court acknowledged the *pro se* filing, noting that Mr. Perkins "revokes the powers of attorney that we might have I guess, and we're all ordered to cease

4

and desist, and we cannot represent him anymore because he's revoking our powers of attorney." DC Doc. 157; Doc. 253 at 22.

The court then asked Mr. Perkins if he wanted to waive his right to counsel. An extended and somewhat circular exchange took place, during which Mr. Perkins explained:

> For and on the record, I don't accept – I never accepted any representation. Mr. – she already admitted that I've never accepted any representation, so that's what it sounds like to me.

He later repeated:

> For and on the record, I do not accept counsel. I do not accept anyone representing – to represent. I never did.

Doc. 253 at 25-32. The court then turned to Mr. Spencer, who explained:

> Mr. Perkins' position as I understand it, judge, is that when he was arrested and brought to this court, he never asked to be appointed counsel. That he never said on any record, paper, document that he needed counsel, and that therefore any appointment of counsel is invalid.
>
> . . .
>
> I think there's an implicit threat of some sort of legal action, and in fact he has said that he does not want counsel. That he has never – I think his position is that he can't waive what he never validly asked for, and so I'm in the position where I can't really effectively represent him. I mean I will do the best I can, but I mean he doesn't want me to represent him, and so that's where I am, judge.

Later, Mr. Perkins stated:

> For and on the record, *I'm not an indigent. I'm financially stable*. I've never accepted counsel. Is this court intending to force counsel on me repeatedly,

5

constantly? Do you understand that what you're doing is fraud? Do you understand that?

Doc. 253 at 39 (emphasis added).[2]  The court determined that appointed counsel should continue to represent Mr. Perkins.  Doc. 253 at 41.

Prior to jury selection, this issue arose again when attorney Spencer told the court, "Certainly I can't say that I am ready [for trial] when Mr. Perkins has not really conferred with me about the case."  Doc. 236 at 67.

### Suppression Hearing

Appointed counsel filed several motions to suppress prior to trial.  Counsel first argued that searches of a bag left at a Ruby Tuesday Restaurant in Tampa ("Tampa bag") and a computer and cellular phone, which were inside the bag, were unreasonable because the searches were not justified by probable cause, exigent circumstances, or a warrant. Doc. 19.  He also argued that subsequent searches of a private residence ("Gables apartment") and photo line-ups were tainted by the original illegal search.  Doc. 19.  Counsel later argued that although the search of the Tampa bag was performed pursuant to a warrant, it was unreasonable because the police did not obtain the search warrant until at least three weeks after they seized the bag and that the forensic imaging of a laptop computer found in the bag did not

---

[2]    Mr. Perkins asserts that he also filed an affidavit of financial solvency, which has since been stricken from the record.

comply with the warrant requirements.  He further argued that the warrant was not based upon probable cause because the affidavit in support of the warrant relied solely on information provided by a confidential informant, but was silent on the credibility of the confidential informant.  Doc. 51. Counsel also filed a separate motion to suppress identifications obtained using suggestive photographic line-ups and unreliable identifications.  Doc. 21.

The witnesses testified as follows at the hearing:

Alana Stump, a U.P.S employee, testified regarding a large amount of mail received at a particular postal box maintained by the store.  When asked if there was any unique feature that stood out about one of the men who picked up the mail, she stated, "Just the gold teeth." Doc. 83 at 44. She said this person came in twice a week for six months and that he was not there for more than 15 or 20 seconds each time. Doc. 83 at 45.  On August 18, 2009, she received an email from a detective containing a single picture with the subject line "Is this the other guy that checks the mail at 709."  Doc. 83 at 46-47.  She replied that it was.  Six months later, she was shown a photo array and she picked the same photo she had previously been emailed out of the line-up.  Doc. 83 at 61. She stated that she could not remember if the pictures were shown in black and white or in color, but that the only person who appeared to have gold teeth in the line-up was the person she selected. Doc. 83 at 60-61. When asked if the gold teeth were the only feature she used to identify the

7

person, she stated, "That was the main thing I would say if I had to describe him if you asked me." Doc. 83 at 62.

Chester Dixon, the owner of the U.P.S. store, was interviewed by police in February 2010 regarding the same two men. He stated that he saw the second man at least three times in March, April, and May of 2008. Doc. 83 at 17. The officer showed Mr. Dixon a six-picture photo line-up and asked him to identify the second man. He picked picture #2 and described the person depicted as having "unique dental work," and "gold dental." Doc. 83 at 22.

William Parris, a sales associate at Wolf Camera, was interviewed by the FBI in February 2010 about two customers who came in together on two separate days a few weeks earlier. Doc. 83 at 68-69. He was shown two six-picture photographic arrays, one for each customer. He selected the person in position #2 in the first photo line-up. He was also shown a single picture line-up of the man in picture #2. Doc. 83 at 79. When asked what stood out to him, Mr. Parris responded, "The fact that the picture in number two has what the term 'grill' would be in the picture, and that stood out." Doc. 83 at 71-73. He could not identify the second man from the second photo array. Doc. 83 at 77.

Matthew Delillis, a manager at Ruby Tuesday in Tampa, Florida, testified that on October 23, 2009, a customer had left a bag behind in the restaurant. When he opened the bag to look for identification, he found a stack of credit cards with

different names on them, a laptop computer, and an electronic device attached up to the laptop.  He called the police and a police officer came to retrieve the bag. Doc. 83 at 108-111. Later, someone called the restaurant looking for the bag and then a man and a woman showed up asking about the bag.  Mr. Delillis told them the bag had been given to the sheriff because it contained "suspicious items."  Doc. 83 at 112-114.  When asked if there was anything distinguishing that stood out about the man, Mr. Delillis testified, "I recognize for sure they had gold teeth." Doc. 83 at 115. Three weeks later, he identified the person in picture # 2 in a color photo array as the person who returned for the bag. Doc. 83 at 118, 120, 126. He testified that it does not appear that any of the other individuals in the photo array have gold teeth. Doc. 83 at 126.

Tampa police officer William Feazell testified that he looked through the bag after retrieving it from Ruby Tuesday.  He turned on the cell phone, but couldn't figure out how to turn the laptop on.  Doc. 83 at 135-37.  According to his inventory report, the bag contained: 19 credit cards, a sony viao laptop, Motorola cell phone, and some correspondence.  Doc. 83 at 177.

At the request of the Atlanta FBI office, Tampa FBI Agent Wolfenden retrieved the bag from the Tampa police, did a "cursory review of it, and "saw generally what was in there."  Doc. 83 at 159.  He received the bag on a Friday, but he did not conduct an inventory or put the bag into evidence until the following

Monday.  Doc. 83 at 160.  He obtained a search warrant approximately a month after retrieving the bag.  Doc. 83 at 174.

Atlanta FBI Agent Chad Hunt testified that he received information about the lost bag during two separate proffer sessions with a person named Larry Whitfield. Whitfield later brought the FBI a laptop and a small electronic storage device allegedly pertaining to this case, neither of which were used at trial because the FBI questioned how Mr. Whitfield obtained this evidence.  Doc. 239 at 578.

At the close of the hearing, the court instructed the parties that "to the extent that you have raised issues in any of the motions that were filed with regard to suppression issues . . . to the extent that that is not briefed, then the court is going to deem that moot or otherwise abandoned, withdrawn." Doc. 83 at 202.

Appointed counsel filed a post-hearing brief, in which he re-briefed his argument regarding the suggestive photo-line up and he argued that the warrants in the case were unlawful because the magistrate was not provided with information about the suggestive nature of photo identifications. Doc. 92. The magistrate court recommended that the defendant's motion to suppress eyewitness identification be denied on the merits, but denied the other motions as moot because they were not re-briefed post-hearing.  Doc. 129.

The magistrate court also ruled that the portion of Mr. Perkins' motion regarding the forensic imaging and search of a laptop computer found inside the bag

should be deemed moot because the government had stated that it has no intention of using evidence from the imaged laptop. Doc. 129.

The district court adopted the magistrate court's report and recommendation. Doc. 145. At trial the government introduced evidence from the laptop found in the Tampa bag and from a laptop found at the Gables apartment. Doc. 238 at 311, 313; Ex. 130, Ex. 131. Exhibits 132, 133, 134, 161.2, 163, 167 were either items allegedly located in the Tampa bag or in the apartment or they contained references to items found in those locations. Doc. 238 at 314; Doc. 239 at 687-691, 702, 705. Appointed counsel renewed his pretrial motion and/or objected to the introduction of related evidence several times during trial. Doc. 238 at 313, 315.

### Mr. Perkins Absence at Trial

On the day trial was set to begin, a deputy marshal informed the court that Mr. Perkins did not want to leave the holding cell area to be brought to the courtroom. Doc. 236 at 2-3. After an extended discussion, the court decided that it, along with the attorneys and a court reporter, should go to the interview room in the holding area to speak with Mr. Perkins. Doc. 236 at 4-39. The judge noted that she wanted "as few people as possible" present at this meeting. She decided to forgo the robe and wear plain clothes. Doc. 236 at 31, 37. When they arrived, Mr. Perkins attempted to leave the interview room to return to the holding cell area, but was required to stay. The entire time the court was talking, Mr. Perkins repeatedly stated,

"I do not understand," "I do not agree," and "I'm here against my will."  Doc. 236 at 39-44.

Although Mr. Perkins was not present in the courtroom, a jury was selected and seated on June 20, 2011.  Doc. 236. The trial commenced the following day.

Prior to the government resting its case, a deputy marshal told the court that he had informed Mr. Perkins of his right to testify and that he had stated, "I'm not going to testify because that's not me." Doc. 239 at 726.  Shortly before the closing arguments, appointed counsel again stated that Mr. Perkins did not want him for a lawyer and that he was not authorized to do anything on Mr. Perkins' behalf.  Doc. 239 at 728.

### Testimony at trial

At trial, the government presented evidence consistent with its allegations in the indictment. Trial testimony related to only two issues is relevant on appeal: the use of identifying information belonging to Lisa T. Evans (as to count 37) and government's attempt to satisfy the identity requirement in the absence of a defendant (as to all counts).

### Identifying information belonging to Lisa Evans

Agent Warren testified that the Gables apartment, where a search had been performed, was leased in the name of Lisa T. Evans.  Doc. 237 at 274.  The date of birth and social security number on the lease was the same as that of a white female

named Lisa T. Evans who testified at trial. Doc. 237 at 275, 277; 238 at 333. The lease file also referenced an Ohio driver's license number and contained a copy of an Ohio driver's license bearing the name Lisa Evans and containing a picture of a black female. Doc. 237 at 276. Agents found letters to Lisa Evans regarding rent and insurance inside the apartment. Agent Warren testified co-defendants Christopher Taylor and John Sorden, as well as confidential informant Larry Whitfield had access to the apartment. Mail, driver's licenses, photographs, and other personal items belonging to these three people were found inside the apartment. Doc. 238 at 304, 309, 322, 324. Mr. Taylor returned to the apartment after his arrest. Doc. 238 at 322. No handwriting analysis was done on the lease paperwork. Doc. 238 at 324.

Appointed counsel's motion for judgment of acquittal as to count 37 was denied. Doc. 239 at 731.

### *Identity of the defendant*

Because there was no defendant present at trial, the government attempted to show that Mr. Perkins was the person described in the indictment by admitting a picture into evidence. Ex. 177. Agent Warren identified the person in the picture as "Jean Daniel Perkins, also known as Daniel Mathews, also known as LJ." Doc. 238 at 320. The agent testified that this was the same person he arrested on February 26,

2010, and that he had seen the person in other court proceedings in this case. Doc. 238 at 320.

Despite the fact that he was never asked to identify the defendant at the suppression hearing, Mr. Delillis testified the defendant at that hearing was the person he picked out of the photo line-up. Doc. 238 at 348. Agent Hunt testified that the person depicted in spot # 2 in the line up (Ex. 178) was Jean Daniel Perkins. Doc. 239 at 682.

Co-defendant John Sorden testified that he recognized Jean Perkins from exhibit 177, but he did not identify the person in the picture as the person currently on trial.

### Post-trial motions

Attorney Spencer filed a motion for new trial in which he argued that the court erred in conducting the trial without the defendant ever being present. Doc. 190. This motion was denied after sentencing.[3] Doc. 313. Mr. Perkins filed his own *pro se* motion to recuse the judge, alleging the following:

---

[3] At sentencing, attorney Spencer had made clear that part of his argument regarding the new trial was that Mr. Perkins was denied a public trial. The court responded that it "would have let anybody come that could have fit in the room. You know, we weren't keeping them out." Doc. 326 at 63.

14

- After being thrust into a holding cell by the marshals, he was confronted by Judge Carnes, appointed counsel Spencer, U.S. attorneys, and a court reporter. Doc. 283 at ¶¶ 8,9.

- "Mrs. Carnes appeared to be in plain clothes, without gavel and there was no jury or any members of the public present or allowed to be present." Doc. 283 at ¶ 12.

- He attempted to exit the cell, but Judge Carnes ordered the marshals not to let him out. Doc. 283 at ¶ 15.

- To "protect himself on the record," he repeatedly stated, "I don't understand, I do not agree, I am here against my will, I am under threat, duress, and coercion." Doc. 283 at ¶ 18.

- After the recording was turned off, Judge Carnes stated, "I don't know why you're doing all of this, I don't know why you're resisting because we're going to get you anyway (¶20)," and "You see, it's the ones like you that I hate the most (¶22)."

- "After the above exchange, the affiant was absolutely positive that he did not intend to participate in such prejudicial proceedings and thus passively refused to cooperate." Doc. 283 at ¶ 23.

He signed the document "under penalty of perjury." Doc. 283 at 4. In its final order in the case, the court denied the allegations contained in paragraphs 20, 21 and 22 and denied the motion. Doc. 313 at 52-53.

### Sentencing

Mr. Perkins was not present in the courtroom for any portion of the sentencing

15

proceeding[4].  The guideline calculations were as follows:

| | | |
|---|---|---|
| 7 | base level offense | (U.S.S.G § 2B1.1) |
| +20 | loss of $7,000,000 - $20,000,000 | (U.S.S.G § 2B1.1(b)(1)(M)) |
| +6 | more than 250 victims | (U.S.S.G § 2B1.1(b)(2)(C) |
| +4 | leader or organizer | (U.S.S.G § 3B1.1(a)) |
| +2 | obstruction of justice | (U.S.S.G § 3C1.1(a)) |

= Level 39, Criminal History Category IV = 360 to life

The court added an additional two-year consecutive sentence for the aggravated identity theft count.  Appointed counsel objected to this additional sentence.  He also objected to the enhancement for obstruction of justice based upon Mr. Perkins' failure to participate in the trial proceeding.  Doc. 326 at 34.  He also argued that, based upon Mr. Perkins' arrest record dating back to age seven and his history of mental illness, a sentence of less than 30 years was appropriate.  Doc. 326 at 45.  The court ultimately imposed a sentence of 360 months in prison.  The court left the record open for Mr. Perkins to file a pro se response.

---

[4]    The court attempted to visit Mr. Perkins in the holding cell area again prior to sentencing, but was told that he was on the toilet the entire time.

16

### *Competency*

Prior to the final entry of sentence, appointed counsel filed a motion for order on competency to stand trial or sentencing. Doc. 307. Counsel wrote that one of his other clients had observed Mr. Perkins in the jail facility and that he "seemed crazy." Counsel also noted that a childhood friend of Mr. Perkins had recently visited him and learned that he was on medications for schizophrenia, bipolar disorder, depression, and anxiety. The friend explained that Mr. Perkins believed that the government and defense counsel were conspiring to kill him and that someone had been tampering with his food. Counsel explained that the friend believed that Mr. Perkins has mental health issues. Doc. 313 at 54; Doc. 307.

The court found that taped telephone conversations of Mr. Perkins' from the jail showed that he was trying to manipulate the proceedings; therefore, despite the fact that it had previously acknowledged Mr. Perkin's bizarre behavior during court appearances and in court filings, it denied counsel's motion. Doc. 313 at 54.

### *Standards of Review*

*See* Argument section.

17

## SUMMARY OF THE ARGUMENT

Mr. Perkins' trial and sentencing were permeated by a lack of fundamental fairness as a result of his absence from the courtroom, his incompetence to stand trial, and the bias the trial judge held against him. The court caused his absence by forcing appointed counsel upon him, despite the fact that Mr. Perkins repeatedly rejected counsel and asserted that he was not indigent.

The court erred in denying several motions to suppress as moot based upon its mistaken understanding of the evidence to be presented at trial and upon its belief that counsel did not fully brief the issues. It also erred in denying a motion challenging unreliable identifications based upon suggestive photographic line-ups.

The jury had insufficient evidence to verify that the person described in the indictment was actually the person being held by the marshals or to find that the crime of aggravated identify theft had been committed by anyone associated with the case.

As a result of all of these issues, the sentence imposed was erroneous and unreasonable.

18

## ARGUMENT

## I.    THE DISTRICT COURT ERRED IN FORCING APPOINTED COUNSEL ON MR. PERKINS.

*Standard of Review:* The question of whether a defendant was denied counsel of his choice is reviewed for structural error.  When a Constitutional error is found to be structural, automatic reversal is required.  *United States v. Gonzalez-Lopez*, 548 U. S. 140 (2006).

An element of Sixth Amendment right to counsel is the right of a defendant who does not require appointed counsel to choose who will represent him. *See Wheat* v. *United States,* 486 U. S. 153, 159 (1988); *Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.").  The Supreme Court has recently described this right, separate and apart from the guarantee to effective representation, as "the root meaning" of the Sixth Amendment. *Gonzalez-Lopez*, 548 U. S. at 147-48.

As the Supreme Court has also held:

An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.

*Faretta v. California*, 422 U.S. 806, 819-21 (1975).  The *Faretta* Court further noted:

19

[I]t is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want.

*Id. at* 833-34.

Indeed, the Court has held that the wrongful deprivation of choice of counsel is "structural error," because it "pervades the entire trial." *Gonzalez-Lopez*, 548 U.S. at 150.  To illustrate a violation of the Counsel Clause, a defendant need not show that trial counsel was ineffective or that counsel of choice would have pursued a different strategy.  *Id.* at 146.  The clause "commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best. *Id.*  When a trial court erroneously deprives a defendant of his right to counsel of his choice, the right is violated.  No additional showing of prejudice is required to make the violation "complete." *Id.*

In the present case, Mr. Perkins filed numerous documents asking that appointed counsel be removed and asserting that he was not indigent.  *See e.g.*, doc. 91 (Revocation of "Power of Attorney"), doc 267 (Motion to Quash C.J.A. appointment); doc. 282 (Motion for Order to Restrain and Terminate Appointed Counsel).  The court acknowledged these documents and told the attorneys that "we cannot represent him anymore because he's revoking our powers of attorney."  Doc. 253 at 22.

Mr. Perkins also informed the court verbally that he did not wish to continue with appointed counsel:

> Any representation, any of your esquires, attorneys or barristers or counselors or whatever you want to call it, I have never accepted the benefits as they are under the Criminal Justice Act of 1964. I am not an indigent, a ward.

Doc. 151 at 2-3.

Appointed counsel also noted on several occasions that Mr. Perkins did not wish to be represented by appointed counsel. *See, e.g.,* doc. 139 at 1 ("Mr. Perkins has made it clear that he does not want the undersigned as counsel. Moreover, upon information and belief, Mr. Perkins never wanted counsel appointed to him under the Criminal Justice Act."); doc. 150; 150-1 at 3 (reiterating that "Mr. Perkins *never* wanted counsel appointed") (emphasis in original).

Counsel also explained before trial started that he and Mr. Perkins had conflicts that were "insurmountable relating to strategy in the upcoming trial." Doc. 139 at 1. The court made no inquiry into these conflicts so it could not make an informed decision regarding the need for new counsel to protect Mr. Perkins' right to effective representation. *See United States v. Torres-Rodriguez*, 930 F.2d 1375, 1381 (9th Cir. 1991) (holding that the trial court erred in failing to inquire into nature of conflict and amount of delay required in substituting counsel); *United States v. Musa*, 220 F.3d 1096 (9th Cir. 2000) ("Even if a defendant's counsel is competent, a serious breakdown in communication can result in an inadequate defense.").

21

Based on all of the documents Mr. Perkins filed, the representations of appointed counsel, and even the court's own observations, it is clear that Mr. Perkins intended to revoke any power he initially gave the court to appoint counsel. This is not a case in which Mr. Perkins was asking that a different CJA attorney be appointed; he clearly stated that he was not indigent and that he did not need an appointed attorney, nor did he want one. The court's decision to force appointed counsel on him constituted structural error and, as a result, requires reversal.

## II.    THE DISTRICT COURT ERRED IN DENYING SEVERAL MOTIONS TO SUPPRESS EVIDENCE.

*Standard of review*:  With regard to motions to suppress, this court reviews the district court's factual findings for clear error and its legal conclusions *de novo. United States v. Nunez,* 455 F.3d 1223, 1225 (11th Cir.2006).  The court reviews a district court's evidentiary rulings for an abuse of discretion. *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir.1992).  This court reviews *de novo* whether an in-court identification violates a defendant's Fifth Amendment right to due process. *United States v. Douglas*, 489 F.3d 1117, 1126 (11th Cir. 2007).

### A. The District Court erroneously found that two of Mr. Perkins' motions should be denied as moot.

Defense counsel filed motions to suppress evidence obtained during illegal searches of the Tampa bag, the Gables apartment, and several computers, and during suggestive photographic line-ups.  Despite the fact that Mr. Perkins had filed pre-

hearing motions regarding these issues, the court determined that motions regarding

the residence and bag should be denied as moot because they were not re-briefed

post-hearing. While counsel did not re-brief these issues after the hearing, his pre-

trial motions did comply with the court's instruction that "to the extent that that [an

issue is] not briefed, then the court is going to deem that moot or otherwise

abandoned, withdrawn." Those motions argued:

- [T]he affidavit submitted to obtain the warrant fails to establish probable cause to justify the search and thus does not meet the criteria set out in *Illinois v. Gates*, 462 U.S. 213 (1983) as required to issue an [sic] warrant.  Doc. 19 at 3.

- The warrant deficiencies [being tainted by the initial illegal search and lack of probable cause] put this search outside the boundaries of the Good Faith Exception as set out in *United States v. Leon*, 468 897 (1984).  Doc. 19 at 3.

- Despite [the fact that agents had known about the existence of the Tampa bag in police custody for more than a month], the agents impermissibly delayed in seeking a search warrant [for the bag].  *See United States v. Mitchell*, 565 F. 3d 1347 (11th Cir. 2009).  Doc. 51 at 2.

- In addition, the information provided in the application was not sufficient to authorize the issuance of a warrant.  The affidavit relied solely on information obtained by the CI and is silent on his or her credibility and contains no corroboration of the information.  *See United States v. Foree*, 43 F.3d 1572, 1575 (11th Cir. 1995).  Doc. 51 at 3.

The Northern District of Georgia's Local Rule 7.1 only requires that every

motion cite supporting authority.  It does not provide a qualifier as to how much

authority should be provided.  Counsel complied with this rule and with the court's

instruction regarding briefing issues that had not already been briefed.  For those reasons, docs. 19 and 51 should not have been denied as moot.  Because the district court did not reach the substantive issues outlined in these two motions, this court has no substantive rulings to review. *See United States v. Johnson*, No. 07-14216, opinion filed on October 3, 2008, at 13 (11th Cir., 2008).  Therefore, at a minimum, a remand is necessary to give the district court an opportunity to review and rule on these issues.

The court also erroneously ruled that the portion of Mr. Perkins' motion regarding the forensic imaging and search of a laptop computer found inside the Tampa bag should be deemed moot because the government had stated that it had no intention of using evidence from the imaged laptop.  This ruling was made in error because the government had previously explained that it *did* plan to use evidence obtained from this laptop at trial and, in fact the laptop itself was admitted as exhibit 130; its external hard drive was admitted as exhibit 131. Doc. 238 at 313-14.  It was error to admit these items -- and the information contained therein -- over defense counsel's preliminary and contemporaneous objections.  *See* doc. 238 at 313, 315. Because it is impossible to determine if this evidence was relied upon by jury in its deliberations, reversal is required. *See Bumper v. State of North Carolina*, 391 U.S. 543, 550 (1968) (Error in admitting evidence was "plainly damaging against the petitioner" and therefore could not be harmless.).

24

**B. The district court erred in finding that the out-of-court identifications by Mr. Dixon and Mr. Delillis were not unduly suggestive.**

Appointed counsel argued that warrants issued in the case relied, in part, on unreliable witness identifications and that the reviewing magistrate should have been informed of the suggestive procedures used to obtain them. Counsel requested a new evidentiary hearing to determine if, without these improper identifications, the magistrate would have found probable cause to issue the warrant. The district court denied this request, finding that two of the identifications were not based upon an unduly suggestive line-ups and that all of the identifications were reliable.[5] Based upon the testimony at trial, the identifications were the result of suggestive procedures and they should not have been relied upon in the affidavits.

Ms. Stump, Mr. Dixon, and Mr. Parris were shown black and white photos by a police officer. Mr. Delillis was shown color photographs by a postal examiner. Two of the men were shown a six-photo array, Mr. Stump was initially shown a single photo, and Mr. Parris was shown both a single photo and a six-photo array during the same visit. Without exception, each witness stated that the "gold dental work," "gold grill," or "gold teeth" stood out to them when they made their

---

[5]    The court found that "the single photographs show to Stump and Parris may have been unduly suggestive," but that there identifications were otherwise reliable. Doc. 129 at 19.

25

identification from the line-up. *See* Doc. 83 at 22 (Dixon picked the person having "unique dental work," and "gold dental."); Doc. 83 at 62 (Stump said the gold teeth were "the thing that stood out to me the most."); Doc. 83 at 73 (Parris stated that the "grill" "stood out."); Doc. 83 at 128 (Delillis: "[T]he gold teeth are definitely something that would put it over the edge.").  Mr. Delillis also noted that it did not appear that any of the other individuals in the photo array have gold teeth. Doc. 83 at 126.

All of the photographic line-ups – not just the two identified by the court – were unduly suggestive because only one person in the line-up had the distinctive dental work that was so crucial to each identification.

The identifications were also unreliable based upon the factors outlined in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), which include:

> 1) the opportunity of the witness to view the person at the time of the crime,
> 2) the witness' degree of attention,
> 3) the accuracy of his prior description of the criminal,
> 4) the level of certainty demonstrated at the confrontation, and
> 5) the time between the crime and the confrontation.

Ms. Stump testified that she saw the person who picked up mail once or twice a week for about 15-20 seconds over a period of six months. No evidence was presented to pinpoint the time frame between the last time she saw the individual and the time she selected someone from the photo line-up.  She did not remember if the detective asked her to give a description of the man before viewing the photos,

26

but stated that "all I would be able to tell her about him" was that he was a "black male, stocky, and the gold teeth."  Doc. 83 at 57.  She stated she was 100% certain that she picked the correct photo from the six-photo line-up, but it was the ***same photo*** the officer had previously emailed to her.  The fact that the district court found that Ms. Stump's identification from the single photo array may have been suggestive, yet found her selection of ***the same photo*** from the six-photo line-up to be reliable undermines the reliability determination.

Mr. Dixon made his identification more than a year and a half after seeing the man.  He stated that he had seen the person three or four times during a three-month period, but only testified about viewing the man's face during their first meeting.  Doc. 83 at 17.  Dixon stated that he was only 80% confident in his selection.  Doc. 83 at 21.  Before picking out a picture from the line-up, Mr. Dixon did not give a physical description of the person "other than being black."  Doc. 83 at 29.  He testified that because the photos were black and white, he could not quite tell whether the person depicted in photo number 2 (the photo he selected) had gold teeth, but that "you can certainly see that he has something on his front teeth," and "had I seen the gold teeth in color, I mean, I would have been a hundred percent sure." Doc. 83 at 34.

Mr. Parris was show both a six-photo array and a single photo in the same interview.  He made his identification approximately six days after the man had been

27

to his store.  He saw the man with another man two days in a row for ten to fifteen minutes the first day and for twenty to thirty minutes the second day. He testified that during part of the time the men were in the store, he was putting away boxes. Doc. 83 at 75. Prior to seeing the line-up, he described one of the men as having a "grill" or "gold teeth" as a "distinguishing mark." Doc. 83 at 70.  He testified that he was ninety or ninety-five percent certain of his selection on the day he testified but, when pressed by the government, he admitted that he had previously told them he was only seventy-five percent certain.  Doc. 83 at 77.  Notably, Mr. Parris was shown a separate photographic line-up to see if he could identify the second man who came into the store (the one he stated did not have gold teeth). He could not identify anyone from the line-up despite the fact that he had seen both men for the same amount of time under the same circumstances.

Mr. Delillis gave no prior description to authorities before viewing the line-up.  He made his identification approximately three weeks after seeing the man one time for less than five minutes.  He testified that he was 98% sure in his selection, but he also noted that it was the gold teeth that "put it over the edge."  Doc. 83 at 128.

Analyzing the *Biggers* factors only makes it more obvious that the witnesses focused on the only person in the line-up that had visible gold teeth when selecting the photograph.  It is possible that a reviewing magistrate could have found that such

28

a suggestive process produced unreliable results and therefore should not have been relied upon in issuing the warrant. Had the court reviewed the warrant applications without the inclusion of the witness identifications, it might have determined that officers did not have probable cause for the searches they conducted. Based on the lack of information about this suggestive line-up in the warrant applications, a hearing should have been ordered pursuant to *Franks v. Delaware, 438 U.S. 154 (1978)*. The district court erred in denying the request for a hearing.

### C. The in-court identification by Mr. Delillis violated Mr. Perkins' Due Process rights.

"A pretrial identification and subsequent in-court identification may amount to a due process violation if the pretrial procedure was 'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Jones v. Kemp*, 794 F.2d 1536, 1539 (11th Cir.1986).

In this case, the government also attempted to use the testimony of Matthew Delillis to make an in-court identification of Mr. Perkins despite the fact that Mr. Perkins was not present at trial. Mr. Delillis testified that the defendant present at an earlier hearing in the case was the same person he had picked out of the photo line-up. Not only was this identification the result of the unduly suggestive line-up outlined above, but it was also unreliable as an in-court identification because Mr. Delillis never identified anyone at the suppression hearing. There is no evidence

29

that Mr. Delillis even saw the defendant there or knew who he was.   To allow such testimony to be used to bolster the government's allegation that the person on trial was the same person identified in the line-up was improper because there was no factual basis for this identification.

## III.   THE DISTRICT COURT ERRED IN DENYING MR. PERKINS' MOTION TO RECUSE.

***Standard of Review***:  This Court reviews a judge's decision not to recuse herself for an abuse of discretion. *United States v. Berger*, 375 F.3d 1223, 1227 (11th Cir. 2004).

Defendants in the American judicial system have the right to a fair trial, and part of this right is fulfilled by a judicial officer who impartially presides over the trial. *Bracy v. Gramley,* 520 U.S. 899, 904-05 (1997).  A judge violates a defendant's due process rights if he or she is biased against the defendant or has an interest in the outcome of the case.  *Id.* at 905.  "A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Edwards v. Balisok,* 520 U.S. 641, 647 (1997).

Recusal is governed by two federal statutes, 28 U.S.C. §§ 144 and 455.  Under 28 U.S.C. §144, a judge must "proceed no further" and another judge must be assigned when a party files a timely and sufficient affidavit that the judge has a personal bias or prejudice either against him or in favor of any adverse party.  28

30

U.S.C. § 144. For the purposes of § 144, the factual assertions outlined in the affidavit must be taken as true. *Berger v. United States,* 255 U.S. 22, 36 (1921); *United States v. Furst*, 886 F.2d 558, 582 (3rd Cir. 1989), *cert denied*, 493 U.S. 1062 (1990) (Neither the truth of the allegations nor the good faith of the pleader may be questioned, regardless of the judge's personal knowledge to the contrary.). To warrant recusal under § 144, the moving party must only allege facts that would convince a reasonable person that bias actually exists. *See Christo v. Padgett*, 223 F.3d 1324, 1333 (11th Cir. 2000). As the *Furst* court explained:

> [W]here the basic underlying facts as set forth in the affidavit supporting a recusal application are not in dispute, the district court should not minutely examine the movant's characterization of them, and weigh the court's memory of what happened against that of the affiant.

*Id.* at 583.

In the present case, Mr. Perkins filed a *pro se* motion and affidavit to recuse Judge Carnes[6] alleging, among other things, that Judge Carnes told him, "I don't know why you're resisting because we're going to get you anyway" and "You see,

---

[6]    He filed a motion to restrain and terminate counsel the same day. Doc. 282. Given Mr. Perkins' non-existent relationship with appointed counsel, there was no accompanying affidavit from counsel as required under § 144. For the purposes of this motion, which the district court analyzed and ruled upon despite asserting that all motions must be filed by appointed counsel, this court should find that Mr. Perkins was acting as his own counsel.

31

it's the ones like you that I hate the most." These allegations – along with statements that were made by the judge during trial – support a recusal. The record confirms much of Mr. Perkins' description of the meeting with Judge Carnes (*e.g.,* that the meeting took place in the interview room where he was being held against his will, he was told he was going to the room to meet his attorney, Judge Carnes was in plain clothes, he repeatedly stated that he "did not understand" and that he "did not agree"). The fact that Judge Carnes and Mr. Perkins may have a different recollection of some of the events that occurred was not an appropriate basis for the denial of his motion. Section 144 requires only that the court evaluate the legal sufficiency of the facts alleged. Allegations that the judge admitted that she was going to "get" Mr. Perkins and that she hated people like him were legally sufficient for a recusal under §144.

Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The question here is "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *United States v. Patti,* 337 F.3d 1317, 1321 (11th Cir.2003). The standard is thus an objective one, designed to promote the public's confidence in the impartiality and integrity of the judicial process. *In re Evergreen Sec., Ltd.,* 570 F.3d 1257, 1263 (11th Cir.2009). Under § 455(a), a judge

32

has an "affirmative, self-enforcing obligation to recuse himself *sua sponte* whenever the proper grounds exist." *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989).

Although Mr. Perkins's motion refers to incidents that allegedly happened off the record, there were numerous occasions on the record when it became apparent that Judge Carnes was exasperated with and possibly afraid of Mr. Perkins.   It is also clear that the judge believed Mr. Perkins was guilty and was not afraid to say so on the record. *See, e.g*.:

> "I believe the evidence, when it comes in, is going to show that he was quite clever at figuring out how to obtain millions of dollars from different people." Doc. 237 at 74.

> [Taking a plea] "would clearly be in his best interest at this juncture [before trial began]." Doc. 236 at 24.

> "I would like him to be as restrained as possible. . . . I already asked Scott if we have a muzzle – he said we don't have a muzzle – that I could at least talk." Doc. 236 at 34.

> "We would be outside where he can't get to us, right?" (When the government suggested the court visit Mr. Perkins each day of trial)  Doc. 237 at 65.

> "Frankly, given the marshal's concern, he would have probably had to have been put in a straight jacket [to be brought to court].  I don't know if they are concerned about biting.  I can envision the spector of Hannibal Lector in Silence of the Lambs." Doc. 237 at 72.

> "I don't want to be near him.  Can I be . . . behind a barrier?  I'm not that brave." (When told by marshals that she could meet with him in an interview room.) Doc. 236 at 17.

> "It's the ultimate in manipulation, what he is doing."  Doc. 236 at 32-33.

"He is not a person we can deal with well." (When discussing whether marshals should restrain him to bring him to the courtroom) Doc. 236 at 16.

"He has an antisocial personality." Doc. 321 at 60.

Based upon these statements alone, not to mention Mr. Perkins' *pro se* allegations, there was a sufficient showing of bias on the part of Judge Carnes to support a recusal under §455.  Judge Carnes should have granted Mr. Perkins' motion or recused herself *sua sponte*.

## IV.   THE DISTRICT COURT ERRED IN HOLDING A TRIAL IN MR. PERKINS' ABSENCE.

***Standard of Review***: This court uses a multi-step process to review a district court's decision to try a defendant in absentia.  First, it reviews the district court's interpretation of the relevant procedural rule *de novo*. *See United States v. Curbelo*, 726 F.3d 1260, 1276 (11th Cir. 2013). Next, it examines whether the district court properly exercised its discretion to allow the trial to go forward after finding that the defendant voluntarily waived his right to be present. *United States v. Bradford*, 237 F.3d 1306, 1311 (11th Cir. 2001). If the district court properly found that the defendant waived his right to be present, the court considers "whether the district court abused its discretion in concluding that there was on balance a controlling public interest to continue the trial in the defendant's absence." *Id.* Lastly, if the district court erred in continuing the trial in absentia, the court determines whether the error was harmless. *Id.*

34

Appointed counsel moved for a new trial based upon this issue. This court reviews the denial of a motion for a new trial for an abuse of discretion. *United States v. Dortch*, 696 F.3d 1104, 1110 (11th Cir. 2012).  A court may vacate a judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).

### A. *The court interpreted and applied Rule 43 incorrectly.*

Rule 43 does not permit the trial *in absentia* of a defendant who is absent at the beginning of trial.  *Crosby v. United States,* 566 U.S. 255, 256 (1993) (unanimous decision).  The rule builds on a defendant's constitutional right to be "present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta,,* 422 U.S. at 819 n. 15.  The rule does list as an exception to presence requirement the voluntary absence after the trial has begun of a defendant who was initially "present at trial."  Fed. R. Crim. P. 43(c).  This circuit has held that for purposes of Rule 43, a 'trial has commenced' when the jury selection process has begun."  *United States v. Bradford*, 237 F.3d 1306 (11th Cir. 2001); *see also* Appendix C, Northern District of Georgia Local Rules, App. C-8, ¶ 5(e)(2) (noting that "A trial in a jury case shall be deemed to commence at the beginning of voir dire.")

In this case, the court organized an ambush on Mr. Perkins in a holding cell interview room prior to the beginning of jury selection.  The court explained that it understood that Mr. Perkins did not want to go to court, but that the trial would go

on without him.  Notably, the court explained that "As trial begins . . . we will allow [appointed counsel] to visit."  The court never stated, "now that trial has begun," or "since we are beginning trial here," or words to that effect.  Although the court never called the case[7] or announced that it was commencing trial at that time, it later reasoned that the trial began in the interview room for purposes of Rule 43.  Doc. 313 at 51.

Finding that any error related to its ruling on this issue was invited by Mr. Perkins, the court wrote that "neither he nor his attorney objected at any time to the procedure that the Court followed."  Doc. 313 at 52.  However, it is clear from the record that both Mr. Perkins and his attorney objected to the trial being held in his absence.  In its own final order in the case, the court noted that Mr. Perkins filed numerous motions, which were "repetitive and repeat the defendant's core objections to the proceeding."  Doc. 313 at 532.   Appointed counsel noted that he was not personally ready for trial because he had not really conferred with Mr. Perkins about the case.  Doc. 237 at 67.  He also noted that:

> Mr. Perkins objects to the closed circuit tv. He objects to being present. . . . [He objects] to the whole procedure, Judge. . . . I think he would prefer you stop the trial, Judge.

Doc. 236 at 59.

---

[7]      The clerk called the case in the courtroom after the interview room meeting and before jurors entered the courtroom.  Doc. 236 at 45.

Not only did Mr. Perkins vehemently object to the meeting and the way the court was proceeding to trial against him, but appears he was tricked into coming to the meeting room in the first place. There was an extended discussion on the record of trying to get appointed counsel to convince Mr. Perkins to come to the meeting room or for the marshals to tell Mr. Perkins that he would be meeting with counsel alone if he went to the room. Mr. Perkins' appointed counsel objected to this procedure, stating

> I know that we all have an obligation here and I am concerned about my role in this, if you will. I mean Mr. Perkins has indicated he doesn't want me to be his lawyer. I don't have a defense for Mr. Perkins because he has not discussed the case with me. So I am not comfortable with trying to facilitate getting him in front of a court reporter, if that makes sense.

Doc. 236 at 28. The court later told a marshal:

> He is already balking about leaving his cell. [Tell him,] Look, We'll just take you [the defendant] to the interview room because you need to sort this out. And he may think with [appointed counsel] Spencer, he may think with Judge Carnes, and he may refuse and you can report that back . . . And then I think the court would be on good legal standing to say by all reports he is threatening violence in an effort to avoid having a dialogue that the court needs to have to determine if he waives his presence.

Doc. 236 at 29-30. Inexplicably, the court equated Mr. Perkins' potential refusal to participate in the sham meeting with counsel as "threatening violence" and as justification for holding the trial in his absence.

37

Somehow the marshals got Mr. Perkins to move to an interview room. When he arrived, he was confronted by the district judge, the prosecutor, appointed counsel, and a court reporter. He immediately made it clear that he did not want to be present. The following exchange took place:

| | |
|---|---|
| The Court: | All right. I understand you don't want to go to court today, which I wish you would consider again, but if that's what you – I'm sorry. Why are you all opening the door? |
| The Defendant: | I don't have to be here, so I can't (unintelligbile) |
| The Court: | Well, shut the door, sir. What are you opening that door for? |
| The Defendant: | I'm suing all you motherfuckers. |
| The Court: | All right. Just hear me out, Mr. Perkins. Then you can say whatever you want to say. |

Doc. 236 at. 40. The court went on for several pages of transcript about what would happen once trial actually began. Mr. Perkins repeatedly stated, "I don't understand," and "I don't agree," and "I am here against my will." Doc. 236 at 40-45. The district court's later claim that this meeting satisfied the requirements of Rule 43 is certainly not supported by the record and it does not comply with the binding precedent in this circuit.

**B. The district court erred in permitting the trial to go forward after an alleged waiver.**

In its final order, the district court noted that the "trial proceeded to its conclusion without any objection by the defendant to his absence." Doc. 313 at 48. However, as noted above in section A, both Mr. Perkins and appointed counsel objected to the holding cell meeting and to the trial in Mr. Perkins' absence. Mr. Perkins never waived his right to be present at a proper trial; he simply noted his objections to the procedures being used to try him (*e.g*., forcing an appointed attorney on him) and to the processes being employed to coerce him into waiving his rights. The trial court clearly erred in allowing the trial to go forward under the circumstances.

**C. The district court never made any determination that there was on balance a controlling public interest to continue the trial in the defendant's absence**.

Before finding that a trial can go forward after a rule 43 waiver, the court must consider the likelihood that the trial could take place with the defendant present, the difficulty of rescheduling, the inconvenience to jurors, and the burden on the government and others of having to undertake two trials, particularly in a multiple defendant case. *See Fontanez,* 878 F.2d 33, 37 (2nd Cir. 1989). The court never made any of these determinations when issuing its decision to move forward with the trial.

39

### D. The erroneous determination that Mr. Perkins had waived his right to be present was not harmless.

The district court's decision to allow the trial go forward in Mr. Perkins' absence was extremely prejudicial to Mr. Perkins because, as noted above, his appointed counsel was not prepared to represent his interests at trial. Counsel had not conferred with Mr. Perkins about the trial and there had been a complete breakdown of the attorney-client relationship. This is not a case where Mr. Perkins' presence would have been useless, *see Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), or where Mr. Perkins' input could not have affected the outcome, *see Chapman v. California*, 386 U.S. 18, 22–24 (1967). Mr. Perkins was the only person familiar with his defenses in the case. He repeatedly tried to fire appointed counsel and he repeatedly stated he was not an indigent person. Still, the court failed to conduct an inquiry into "insurmountable" conflicts alluded to by counsel, denied Mr. Perkins the opportunity to seek other counsel, and denied him the opportunity to be present in the courtroom by forcing him to use appointed counsel if he chose to appear in court. As a result of Mr. Perkins' absence from the courtroom, and the absence of a lawyer who truly represented his interests, the court's error cannot be said to have been harmless. Reversal is required.

40

## V.    THE DISTRICT COURT VIOLATED MR. PERKINS' RIGHT TO A PUBLIC TRIAL.

*Standard of review:* Because the right to a public trial is so fundamental to our system of justice, it falls within a very limited class of issues the denial of which has been labeled structural error and which causes automatic reversal. *See United States v. Marcus*, __ U.S. __, __, 130 S. Ct. 2159, 2164-65 (2010).

> The right to a public trial
>
> has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.

In *In re Oliver*, 333 U.S. 257, 270 (1948); s*ee also Waller v. Georgia Cole v. Georgia*, 467 U.S. 39, 46 (1984).

Here, the court justified its decision to hold a trial in absentia by declaring that Mr. Perkins had waived his right to be present during a portion of the "trial" that took place in a holding cell meeting room. Although no announcement was made that trial had begun and no one called the case, the court later determined that because Mr. Perkins, all attorneys, and a court reporter were present, the trial had begun. Doc. 313 at 35. This ruling, however, fails to consider Mr. Perkins' Sixth Amendment right to a *public* trial. As this court has noted, "[A] total closure of the courtroom, even for a temporary period, eliminates for a time the valuable role the presence of spectators can have on the performance of witnesses and court officials,

41

and can create a public perception that the defendant is not being treated justly." *Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001).

A closed hearing burdens the defendant's constitutional rights, and before one is undertaken, "a court must hold a hearing and articulate specific findings." *Id.* Although the court stated that it wanted "as few people as possible" present in the meeting room, it never explained why there was any cause to seal this portion of the "trial" nor did it offer any reason for excluding others from the "proceeding."

Despite the lack of evidence on this issue, the court also attempted to use Mr. Perkins' allegedly violent behavior as justification for not requiring the marshals to bring him to court to face a public trial. The court repeatedly made references to Mr. Perkins being violent or being a lunatic or being like "Hannibal Lector." It did this despite defense counsel's repeated statements that he did not believe Mr. Perkins was dangerous or violent and despite the fact that there was no evidence that Mr. Perkins ever got violent with any of the marshals. The alleged threat of violence was insufficient to justify the decision to close a portion of the "trial." If this court finds that the trial did indeed begin in the holding cell, it is clear that Mr. Perkins' right to a public trial was violated and his conviction should be reversed.

## VI.  THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO CONVICT MR. PERKINS.

***Standard of Review*:** This court reviews the sufficiency of the evidence *de novo,* viewing all the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict.  *United States v. Boffil-Rivera*, 607 F.3d 736, 740 (11th Cir. 2010).

### A. The government did not present sufficient evidence to show that the person described in the indictment was the person on trial (as to all counts).

The "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt." *In re Winship*, 397 U.S. 358, 364 (1970).  "At a minimum, the Government must prove that this defendant committed the crime for which he is on trial." *United States v. Danzey*, 594 F.2d 905, 914 (2d Cir. 1979); *United States v. Wilford*, 493 F.2d 730, 735 fn. 9 (3d Cir. 1974) (holding that unless the defendant chooses to admit participation in the act, identification is an element which the government must prove beyond a reasonable doubt.).  The government's failure to prove that the defendant in a particular case is the person who committed the crime requires reversal.  *See United States v. Johnson*, 427 F.2d 957, 961 (5th Cir. 1970).

Because there was no defendant present at trial in this case, the government attempted to show that Mr. Perkins was the person described in the indictment by

43

admitting a picture into evidence (Ex. 177).  Agent Warren identified the person in the picture as "Jean Daniel Perkins, also known as Daniel Mathews, also known as LJ." The agent testified that this was the same person he arrested on February 26, 2010, and that he had seen the person in other court proceedings in this case.

Co-defendant John Sorden testified that he recognized Jean Perkins from the same picture.  He did not identify the person in the picture as the person currently on trial.  As outlined above in section II, without any evidence to show he had previously seen Mr. Perkins at the suppression hearing, Matthew Delillis said the defendant present at that hearing was the same person he had picked out of the photo line-up.  Agent Hunt testified that the person in spot number 2 on the photographic line up (Ex. 178) was Jean Daniel Perkins.  Doc. 239 at 682.

No evidence regarding the person actually being held for the crime was admitted.  No records were admitted to show that the person agent Warren arrested was still in custody or to show how the agent knew the identity of the person being held.  The government did not admit any photographs of the person who was currently being held in connection with the case, nor did it request that Mr. Perkins be present during the portion of the trial when witnesses would attempt to identify the defendant.  Rather than proving the element of identity beyond a reasonable doubt as required, the government basically asked the jury to take its word for the fact that Mr. Perkins was indeed the person described in the indictment.  The jury

44

had no opportunity to compare the admitted picture with an actual person to verify the government's allegations. *Compare United States v. Ayala*, 289 F.3d 16, 25 (1st Cir. 2002) (in which the trial court could compare admitted photographs to defendants present.)

Further, as has been previously established, Mr. Perkins had a complete breakdown in communications with his lawyer and his lawyer admitted that he had not discussed the case with Mr. Perkins. Therefore, it cannot be said that, by acquiescing to the actions of his lawyer, Mr. Perkins sat mute on the issue of identity at trial. *Compare Butler v. United States,* 317 F.2d 249, 252 (8th Cir. 1963) (noting that it was inconceivable that a defendant would sit mute and subject himself to trial if he believed he was being tried for an offense with which he was completely disassociated.) In fact, when informed by a *marshal* of his right to testify, Mr. Perkins stated, "I'm not going to testify because that's not me." Doc. 239 at 726. Nor is this a case where some sort of presumption arises that Mr. Perkins is the person named in the indictment because of his counsel's words or actions. *See United States v. Weed*, 689 F.2d 752 (7th Cir. 1982) (inferring from the fact that defense counsel did not object to the prosecution's references to Weed as "the defendant" that Weed was the person charged in the indictment.) In this case, counsel told the court that he had no authority to act on Mr. Perkins' behalf; therefore, any actions of counsel on this issue were not condoned by Mr. Perkins. It

45

should also be noted that in both *Butler* and *Weed*, the defendants were present in the courtroom so that jurors could witness their interactions with their attorneys as well as their reactions – or lack thereof – when they were referred to as "the defendant."

Under the circumstances, it is clear that the government failed to meet its burden of actually proving that it had the right person for the crimes charged. For that reason, the court should find that Mr. Perkins should have been acquitted on this all counts.

### B. *The government failed to present sufficient evidence for a jury to find Mr. Perkins guilty of count 37.*

18 U.S.C. 1028A prohibits the knowing transfer, possession, or use without lawful authority, a means of identification of another person during and in relation to certain other felonies. This statute "requires the Government to show that the defendant knew that the means of identification at issue belonged to another person." *Figueroa v. United States,* 556 U.S. 646 (2009).

Even if this court finds that the government did provide sufficient evidence to prove the identity element on all counts, it still failed to show 1) that Mr. Perkins was the person who rented the Gables apartment and 2) that whoever rented the apartment knew that Lisa Evans was a real person.

As appointed counsel noted during his argument for acquittal on this count, the evidence showed that numerous people had access to the apartment and used it on a regular basis, including co-defendants Sorden and Taylor and confidential informant Whitfield. Mail addressed to Sorden and Whitfield as well as photographs of each man were found inside the apartment. A driver's license belonging to Mr. Whitfield was found in the apartment and the evidence presented showed that Mr. Sorden had his own Ohio driver's license. Any of these three other people could have easily rented the apartment. The government did not present any witnesses from the apartment complex to say who had filled out the lease or paid the rent for the apartment and there was no proof offered as to who the African American woman was that was depicted in the Ohio driver's license used to rent the apartment. Presumably, in order to rent the apartment using this driver's license as identification, an African American woman would have had to be present during the rental application meeting. No evidence was offered on this issue.

The government also failed to show that the person who rented the apartment knew that any of the identifying information used belonged to a real person. Although the government can rely upon circumstantial information to prove this element, it must provide some compelling evidence to prove it beyond a reasonable doubt. *See United States v. Doe*, 661 F.3d 550, 562 (11th Cir. 2011). The fact that a woman named Lisa Evans testified at trial does not support in any way the

47

conclusion that the person who used the identifying information *knew* that it belonged to a real person. This is not a case of a person's "repeated and successful testing of the authenticity of a victim's identifying information prior to the crime at issue." *Compare United States v. Doe*, 661 F.3d 550, 562 (11th Cir. 2011). The allegation here is the one-time use of a person's identifying information and the government offered no evidence – direct or circumstantial – to suggest that whoever used the information knew it belonged to a real person. For that reason, Mr. Perkins should have been acquitted as to count 37.

## VII. THE DISTRICT COURT ERRED IN SENTENCING MR. PERKINS TO A TERM OF 360 MONTHS.

*Standard of Review:* This Court reviews the district court's application of the sentencing guidelines *de novo* and its findings of fact for clear error. *United States v. Smith*, 231 F.3d 800, 806 (11th Cir. 2000). The final sentence is reviewed for reasonableness, which is tantamount to an abuse-of-discretion standard of review. *United States v. Pugh*, 515 F.3d 1179, 1188-91 (11th Cir. 2008).

During the sentencing hearing, the court announced the following guideline calculation:

| | | |
|---|---|---|
| 7 | base level offense | (U.S.S.G § 2B1.1) |
| +20 | loss of $7,000,000 - $20,000,000 | (U.S.S.G § 2B1.1(b)(1)(M)) |
| +6 | more than 250 victims | (U.S.S.G § 2B1.1(b)(2)(C) |

48

+4    leader or organizer                  (U.S.S.G § 3B1.1(a))

+2    obstruction of justice               (U.S.S.G § 3C1.1(a))

= Level 39, Criminal History Category I = 360 to life

The court added an additional two years for aggravated identity theft. Appointed counsel objected to the enhancement for obstruction of justice and to the two-year mandatory consecutive sentence for aggravated identity theft.[8]  He also argued that, based upon the § 3553 factors, a sentence of less than 30 years was appropriate.  The court ultimately granted the government's request for a downward variance and imposed a total sentence of 360 months.

### A. *Obstruction of Justice*

U.S.S.G § 3C1.1 permits a two-level enhancement if a defendant

willfully obstructed  or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of his offense of conviction if the obstructive conduct related to (A) the defendant's offense of conviction or any relevant conduct . . . .

In the present case, the court applied this enhancement as a result of Mr. Perkins' failure to come to court for his trial and sentencing.  Appointed counsel argued that the enhancement should not apply because, despite all of his

---

[8]    Appointed counsel also objected to the loss amount proposed by the government based on the number of credit cards recovered.  The court sustained this objection and did not consider the cards in its calculation.  *See* Doc. 313 at 24.

49

protestations, all Mr. Perkins did was make the government go to trial. Doc. 321 at 36.  Counsel argued that Mr. Perkins' absence may have even made the trial go faster.  Doc. 321 at 36.  As the record in this case bears out, Mr. Perkins felt that he was being wrongly held by the court, that the judge was biased against him, and that he had no attorney who would represent his interests.  Under the circumstances, it is not surprising that he refused to participate in what he perceived to be a deceptive and dubious proceeding.  He did not manufacture evidence, threaten witnesses, or provide false testimony. He simply and repeatedly demanded that his appointed counsel be fired.  When his request was not honored, he asserted that he would not participate in any further proceedings with the court.  As the commentary to U.S.S.G § 3C1.1 explains, this provision is not intended to punish a defendant for the exercise of a constitutional right.  Mr. Perkins' objective in not participating in the court proceeding was to protect himself from being represented by a lawyer he did not request and from being tried by a court he felt was biased against him. See sections I and III above.  To enhance his sentence based upon the actions he undertook to protect these rights was improper.

### B. Aggravated Identity Theft

U.S.S.G § 2B1.6 and 18 U.S.C. § 1028A require that a defendant convicted of aggravated identity serve a consecutive two-year term to his guideline sentence. The court applied this mandatory sentence in this case.  However, as outlined in

50

section VI above, which is incorporated here by reference, the government failed to show that Mr. Perkins committed the crime of aggravated identity theft. For that reason, this enhancement should not have been applied.

### C. 18 U.S.C. § 3553 factors

Defense counsel argued that the sentence of 360 months was greater than necessary to meet the goals outlined in 18 U.S.C. § 3553. Counsel relied upon the pre-sentence report and its description of Mr. Perkins' very troubled youth as well as his history of mental health issues. He explained that Mr. Perkins' mother and his foster sister both indicated that he had a difficult childhood and may be in need of mental health treatment. Combined with Mr. Perkins' record of arrests dating back to age seven, counsel argued that Mr. Perkins' mental health issues should dictate a lower sentence with an initial visit to Butner to ensure he is receiving the proper treatment.

In addressing the § 3553 factors, the court noted that the sentence to be imposed was a long sentence for a fraud case, but that it had never seen a defendant with a less compliant attitude toward the law or less regret than Mr. Perkins. Doc. 321 at 59. As noted above in sections I and III, Mr. Perkins was attempting to exercise his Constitutional right to receive proper representation in this case. His frustration at what he deemed an unfair process should not be held against him in determining the proper sentence. Based upon the history and characteristics outlined

51

by appointed counsel, particularly Mr. Perkins' need for mental health treatment, the sentencing imposed was longer than necessary to meet the goals outlined in § 3553.

## VIII. THE DISTRICT COURT ERRED IN NOT ORDERING A COMPETENCY HEARING.

*Standard of Review*: A district court's denial of a motion for a competency hearing, or its decision not to hold such a hearing *sua sponte*, is reviewed for abuse of discretion. *See United States v. Nickels*, 324 F.3d 1250, 1251 (11th Cir. 2003).

The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants. *James v. Singletary*, 957 F.2d 1562, 1569-70 (11th Cir.1992). The test for determining competence to stand trial is "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402 (1960). Whether the defendant is competent is an ongoing inquiry; the defendant must be competent at all stages of trial. *See Drope v. Missouri,* 420 U.S. 162, 181 (1975).

Courts recognize two kinds of competency claims. A petitioner may raise a procedural due process claim by alleging that the trial court should have order a hearing sua sponte. *See Pate v. Robinson*, 383 U.S. 375 (1966). A petitioner may raise a substantive due process claim by alleging that he was tried and convicted

52

while incompetent.  *See James*, 957 F.2d at 1571.  Mr. Perkins raises both claims here.

### *Procedural Due Process*

To prevail on the procedural claim, a petitioner must establish that the trial judge ignored facts raising a "bona fide doubt" regarding the petitioner's competency to stand trial. *James*, 957 F.2d at 1572 n. 15.  Evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant to this determination.  *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995).  Further a defendant's absence from trial has a bearing on the issue of competency.  *See Drope,* 420 U.S. at 180-81 (noting that 1) a voluntary absence could be due to an act that suggests a degree of mental instability contemporaneous with the trial and 2) a defendant's absence prevents the trial judge and defense counsel from observing to gauge from his demeanor whether he is able to cooperate with his attorney and to understand the nature and object of the proceedings against him.)

18 U.S.C. § 4241(a) states that any time after the commencement of a prosecution and prior to sentencing, the court may grant a prosecution or defense motion for a competency hearing.  It further states that the court:

> *shall* order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable

to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

*Id. (Emphasis added.)* Likewise, 18 U.S.C. § 4244(a) states that any time prior to sentencing, the court "shall" order a competency hearing on its own motion:

> if it is of the opinion that there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility.

Here, appointed counsel requested a competency hearing after trial had been completed, but evidence that such a hearing should have been ordered is contained in the record from almost the very beginning of Mr. Perkins' case. For example, when Mr. Perkins' first appointed counsel moved to withdraw, he noted that Mr. Perkins had been suspicious of him since the beginning. Mr. Perkins also filed pro se documents that were described by the court as being "incoherent and riddled with gibberish." Doc. 130 at 1-2. The court also noted that Mr. Perkins representing himself "would be like the rantings of a lunatic asylum." Doc. 253 at 37. In justifying its decision not to have Mr. Perkins brought to court for trial by the marshals, the court stated that "he would have probably had to have been put in a straight jacket. I don't know if they are concerned about biting. I can envision a spector of Hannabl Lecter in Silence of the Lambs." Doc. 237 at 72-73. The court also referred to his behavior as being "of a degree and kind" that she "has never before witnessed in twenty-one years on the bench." Doc. 313 at 25.

54

In addition to the court's own observations, appointed counsel also noted that another client of his had observed Mr. Perkins in the jail and thought that Mr. Perkins "seemed crazy." He also noted that a childhood friend had raised concerns regarding Mr. Perkins competency on more than one occasion. Doc. 307. The friend also noted that Mr. Perkins was taking medicines used to treat schizophrenia and symptoms of bipolar disorder. Counsel notified the court that one of the medicines, if improperly prescribed, could cause depression, panic, anxiety, or obsessive-compulsive symptoms.[9] Doc. 307. According to the childhood friend, Mr. Perkins believed that the government and appointed counsel were conspiring to kill him and that someone was tampering with his food.

Finally, as noted in the PSI, Mr. Perkins has previously been diagnosed with Schizoaffective disorder:

> a condition described as periods of psychotic episodes with a criteria that includes major depression and manic moods. He is prescribed Resperdal . . . for psychosis, and anti-depressant, Effexor . . . and Benedryl . . . to help him for sleep.

> The defendant's mother related from the age of two years old the defendant exhibited mental health problems.

P.S.I. at 40.

---

[9]  If Mr. Perkins' medications were stopped for even a short period of time it could have affected his mental state at all court proceedings.

Despite being informed of these potential mental health issues, the court found that Mr. Perkins was merely trying to manipulate the court system because he continued to use language it found consistent with "sovereign state" defenses. Doc. 313. While it may be true that the court had heard this kind of language before, it does not mean that Mr. Perkins was not simultaneously suffering from mental illness and also using this language. As the *Pate* court recognized, evidence of a defendant's "mental alertness and understanding" does not justify "ignoring the uncontradicted testimony of pronounced irrational behavior." 383 U.S. at 386. The Court held that while a defendant's "demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue." *Id*.

Based on the repeated issues regarding Mr. Perkins' behavior and upon his prior mental illness diagnosis, the court had a duty to investigate further. Rather than risk delay in the proceedings, however, the court stated that Mr. Perkins could raise the issue on appeal or in a 2255 motion and/or he could seek help at the facility where he was being held. Doc. 313 at 55. The court's decision not to order a hearing *sua sponte* during any part of the trial or sentencing and its denial of counsel's motion was an abuse of discretion. As in *Pate*, there was evidence to support the need for a competency hearing prior to trial, during trial, and at sentencing; yet the court chose to ignore that evidence in an effort to move the case along.

56

### Substantive Due Process Claim

The conviction of an accused person while he is legally incompetent violates due process. *See Bishop v. United States*, 350 U.S. 961 (1956). "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope,* 420 U.S. at 171. According to binding precedent in our circuit, a petitioner is entitled to a hearing on his or her substantive incompetency claim upon a presentation of "clear and convincing evidence [raising] a substantial doubt" as to his or her competency to stand trial. *James,* 957 F.2d at 1572.

As outlined above, prior to trial and sentencing, Mr. Perkins had been diagnosed with schizoaffective disorder. He may or may not have been on medication for this and other disorders at the commencement of this case. Despite the fact that he may have used language familiar to the court with the effect of disrupting proceedings, there was still clear and convincing evidence that he was not mentally capable of assisting in his defense. Both of his appointed attorneys notified the court that Mr. Perkins was suspicious of them. Mr. Spencer even explained that Mr. Perkins thought he was trying to kill him. Certainly, these facts combined with Mr. Perkins' behavior at all hearings in this case rise to the level of clear and convincing evidence that he was not competent at the time of conviction or

57

sentencing. Thus, his conviction should be vacated and the case should be remanded for further evaluation of this issue.

## CONCLUSION

For all of the reasons outlined in section VI, this Court should direct a judgment of acquittal on all counts. Should the court determine that such a ruling is improper, Mr. Perkins's convictions should be vacated and a new trial should be ordered pursuant to sections I, II, III, IV, V, and/or VIII. Should the court find no errors other than those occurring at sentencing, remand and resentencing should be ordered. Finally, if the court finds error only in the lower court's denial of motions to suppress as moot, remand is still required so that the court may properly entertain them.

Respectfully submitted this 21st day of May, 2014.

Saraliene S. Durrett

## CERTIFICATE OF COMPLIANCE

In compliance with 11th Cir. R. 28.1(e)(2) and 32(a)(7)(C), I certify that that the foregoing brief complies with the type-volume limitations set out by this court. This brief is written in 14 point, Times New Roman font, and it contains approximately 13,967 words.

Saraliene S. Durrett
2002 Summit Blvd.
Suite 300
Atlanta, GA 30319
404-433-0855

Attorney for Appellant
Jean-Daniel Perkins

## CERTIFICATE OF SERVICE

I certify that on May 21, 2014, I personally served a copy of the foregoing brief on the following parties by placing it in first class mail, postage pre-paid, addressed as follows:

**Lawrence R. Sommerfeld**
Office of United States Attorney
75 Spring Street, S.W.
600 United States Courthouse
Atlanta, GA 30303
404-581-6000


Saraliene S. Durrett
2002 Summit Blvd.
Suite 300
Atlanta, GA 30319
404-433-0855

Attorney for Appellant
Jean-Daniel Perkins

60