Case: 13-13444   Date Filed: 08/29/2014   Page: 1 of 92

No. 13-13444-AA

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

### JEAN-DANIEL PERKINS,
### a/k/a DANIEL MATHEWS, a/k/a LJ,

*Defendant-Appellant.*

---

On appeal from the United States District Court
for the Northern District of Georgia
No. 1:10-CR-97-JEC-LTW-1

---

## BRIEF OF APPELLEE
## THE UNITED STATES OF AMERICA

---

SALLY QUILLIAN YATES
*United States Attorney*

LAWRENCE R. SOMMERFELD
*Assistant United States Attorney*

600 United States Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
(404) 581-6000

No. 13-13444-AA

*United States of America v. Jean-Daniel Perkins,*
*a/k/a Daniel Mathews, a/k/a LJ*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In addition to those listed in Appellant's brief, the following people

and entities have an interest in the outcome of this appeal:


Abbott, Charles Michael, counsel to co-defendant Taylor

Cochran, Anthony L, former counsel to co-defendant Taylor

Combs, Toni, co-defendant

Erskine, Kurt R., Assistant United States Attorney

Lietz, Warren Carl, III, counsel to co-defendant Taylor

McMahon, Patrick Francis, counsel to co-defendant Combs

Taylor, Christopher, co-defendant

United States of America, Appellee

Case: 13-13444    Date Filed: 08/19/2014    Page: 3 of 92

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case. The issues and positions of the parties, as presented in the record and briefs, are sufficient to enable the Court to reach a just determination.

Case: 13-13444    Date Filed: 08/19/2014    Page: 4 of 92

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure
    Statement..........................................................................C-1

Statement Regarding Oral Argument ................................................ i

Table of Contents ............................................................................ ii

Table of Citations ...........................................................................vi

Statement of Jurisdiction............................................................... xiii

Statement of the Issues .................................................................... 1

Statement of the Case....................................................................... 3

    A. Course of Proceedings and Disposition Below..................... 3

    B. Statement of the Facts .......................................................... 3

        1. American Express ......................................................... 3

        2. Suntrust........................................................................ 5

        3. The undercover operation............................................. 7

        4. The Tampa bag .......................................................... 10

        5. Gables apartment 1212 .............................................. 11

        6. Suppression motions .................................................. 15

        7. Refusal to attend trial ................................................ 16

        8. Jail calls..................................................................... 19

        9. Sentencing.................................................................. 22

    C. Standards of Review............................................................ 23

Summary of the Argument.............................................................. 26

Argument and Citations of Authority ............................................. 28

1. Because Perkins requested appointed counsel, and swore to a financial affidavit showing that he could not afford one, he invited the district court to appoint counsel. ........................... 28

2. By failing to object to the R&R, Perkins waived appellate review, and the district court did not clearly err in finding that the witness who identified Perkins at trial did not do so on the basis of an unduly suggestive photo lineup. ............................ 31

   A. Perkins waived appellate review of his motions to suppress evidence by failing to object to their denial in the R&R. .. 31

   B. The district court did not clearly err by finding that the photo array was not unduly suggestive, and that the restaurant manager who saw Perkins reliably identified him. ...................................................................... 34

      1. The district court did not clearly err in adopting the magistrate judge's finding that the photo lineup was not unduly suggestive. .......................................... 35

      2. The district court did not clearly err in adopting the magistrate judge's finding that the identification was sufficiently reliable. ......................................... 38

      3. Any error was harmless. ................................... 40

   C. The district court did not plainly err by allowing Delellis to identify Perkins at trial based on his appearance at an earlier court hearing. ...................................................... 41

   D. Because the jury never heard testimony regarding the other three out-of-court identifications, Perkins's motion to suppress them is moot. ........................................ 43

3. The district court did not abuse its discretion by not recusing. ................................................................ 45

   A. Perkins's *pro se* motion to recuse fails to satisfy the statutory requirements. ...................................................... 45

B. Because Perkins fails to show any external bias, the district court did not abuse its discretion by failing to recuse. ....... 49

4. The district court did not plainly err in concluding that trial commenced in lockup, nor in finding that Perkins constructively waived his right to appear, and that he invited any error................................................................................ 50

5. Perkins invited any denial of his right to public trial, and in any case the district court did not plainly err by commencing trial in lockup when Perkins refused to appear. ............................. 58

6. The evidence was sufficient to support conviction. ................. 60

   A. Sufficient evidence proved identity. .................................... 61

   B. Sufficient evidence supports the inference that the Gables apartment was Perkins's....................................................... 63

   C. Sufficient evidence supports the inference that Perkins knew the identity of an actual person was used to rent 1212 Gables. ................................................................................. 65

7. The district court did not clearly err by applying an enhancement for obstruction of justice, did not err by imposing sentence for aggravated identity theft, nor did it abuse its discretion by imposing a below-Guidelines 360-month sentence. ................................................................................. 67

   A. The district court did not clearly err in finding that Perkins's manipulative efforts to sabotage trial were an attempt to obstruct justice, and any error was harmless....................... 67

   B. The district court did not err by imposing punishment for aggravated identity theft........................................................ 69

   C. The district court did not abuse its discretion by imposing a 360-month sentence, considering the complexity of Perkins's numerous frauds, his manipulation of the justice system, and his profoundly manifest recidivism. ................ 69

Case: 13-13444    Date Filed: 08/19/2014    Page: 7 of 92

8.  No competency hearing was warranted. ................................... 72

   A.  The district court did not abuse its discretion by failing to order a competency hearing *sua sponte*. .............................. 72

   B.  The district court did not clearly err in finding that Perkins was competent, thus denying Perkins's tardy request for a competency hearing. ........................................................... 73

Conclusion ................................................................................... 76

Certificate of Compliance and Service ......................................... 77

Case: 13-13444    Date Filed: 08/19/2014    Page: 8 of 92

# TABLE OF CITATIONS

## Federal Cases

*Berger v. U.S.,

    255 U.S. 22, 41 S. Ct. 230 (1921)................................................. 46, 49

Bonner v. City of Prichard, Ala.,

    661 F.2d 1206 (11th Cir. 1981)...................................................... 47

Cikora v. Dugger,

    840 F.2d 893 (11th Cir. 1988)................................................... 23, 37

Crosby v. U.S.,

    506 U.S. 255, 113 S. Ct. 748 (1993). ...................................... 19, 50

Eisler v. U.S.,

    170 F.2d 273 (D.C. Cir. 1948).................................................... 47

Ferguson v. Sec'y for Dep't of Corrections,

    580 F.3d 1183 (11th Cir. 2009)................................................. 25, 73

Franks v. Delaware,

    438 U.S. 154, 98 S. Ct. 2674 (1978) ............................................ 45

James v. Singletary,

    957 F.2d 1562 (11th Cir. 1992)..................................................... 75

Johnson v. Dugger,

    817 F.2d 726 (11th Cir. 1987)...................................................... 39

*Citations primarily relied upon. 11th Cir.R. 28-1(e).

*Jones v. Newsome,*

    846 F.2d 62 (11th Cir. 1988) ............................................................ 38

*Jones v. Smith,*

    772 F.2d 668 (11th Cir. 1985) .......................................................... 38

*Judd v. Haley,*

    250 F.3d 1308 (11th Cir. 2001) ....................................................... 59

*Liteky v. U.S.,*

    510 U.S. 540, 114 S. Ct. 1147 (1994) ...................................... 49, 50

*Manson v. Brathwaite,*

    432 U.S. 98, 97 S. Ct. 2243 (1977) .......................................... 35, 39

*Marsden v. Moore,*

    847 F.2d 1536 (11th Cir. 1988) ....................................................... 38

*Medina v. Singletary,*

    59 F.3d 1095 (11th Cir. 1995) .......................................................... 75

*Neil v. Biggers,*

    409 U.S. 188, 93 S. Ct. 375 (1972) ................................................. 39

*O'Brien v. Wainwright,*

    738 F.2d 1139 (11th Cir. 1984) ................................................. 35, 38

*\*Parrish v. Bd. of Comm'rs of the Ala. State Bar,*

    524 F.2d 98 (5th Cir. 1975) ............................................................. 46

*Citations primarily relied upon. 11th Cir.R. 28-1(e).

*Turner v. City of Fort Lauderdale*,

    No. 05-61635-CIV,

    2008 WL 2553311 (S.D. Fla. June 20, 2008) ................................. 47

*U.S. v. Berger*,

    375 F.3d 1223 (11th Cir. 2004) ................................................. 24, 49

*U.S. v. Bradford*,

    237 F.3d 1306 (11th Cir. 2001) ................................................. 51, 53

*\*U.S. v. Brannan*,

    562 F.3d 1300 (11th Cir. 2009) ..........................................23, 29, 58

*U.S. v. Brown*,

    669 F.3d 10 (1st Cir. 2012) ............................................................. 75

*U.S. v. Bucci*,

    525 F.3d 116 (1st Cir. 2008) ..................................................... 24, 58

*U.S. v. Cerrella*,

    529 F. Supp. 1373 (S.D. Fla. 1982) .............................................. 47

*U.S. v. Clay*,

    483 F.3d 739 (11th Cir. 2007) ....................................................... 72

*\*U.S. v. Diaz*,

    248 F.3d 1065 (11th Cir. 2001) ..................................................... 35

*U.S. v. Gomez-Castro*,

    605 F.3d 1245 (11th Cir. 2010) ..................................................... 65

*Citations primarily relied upon. 11th Cir.R. 28-1(e).

*U.S. v. Hitt,*

    473 F.3d 146 (5th Cir. 2006) ........................................................ 59

*\*U.S. v. Holmes,*

    595 F.3d 1255 (11th Cir. 2010) .................................................... 66

*U.S. v. Houser,*

    — F.3d —, 2014 WL 2767200 (11th Cir. 2014) ........................ 25, 61

*U.S. v. Jernigan,*

    341 F.3d 1273 (11th Cir. 2003) ................................................ 24, 41

*U.S. v. Jonassen,*

    __ F.3d __, 2014 WL 3455308 (7th Cir. July 16, 2014) .............. 75

*\*U.S. v. Keene,*

    470 F.3d 1347 (11th Cir. 2006) .................................................... 68

*U.S. v. Knight,*

    382 F. App'x 905 (11th Cir. 2010) .......................................... 36, 37

*U.S. v. Lejarde-Rada,*

    319 F.3d 1288 (11th Cir. 2003) ................................................ 42, 60

*U.S. v. Leon,*

    468 U.S. 897, 104 S. Ct 3405 (1984) .......................................... 45

*U.S. v. Lindsey,*

    339 F. App'x 956 (11th Cir. 2009) ...................................... 25, 72, 76

*Citations primarily relied upon. 11th Cir.R. 28-1(e).

*U.S. v. Martinez*,

604 F.2d 361 (5th Cir. 1979) ...................................................... 24, 52

*U.S. v. Pugh*,

515 F.3d 1179 (11th Cir. 2008) ...................................................... 25

*U.S. v. Ramirez*,

491 F. App'x 65 (11th Cir. 2012) ................................................... 74

*U.S. v. Ricks*,

817 F.2d 692 (11th Cir. 1987) ....................................................... 37

*U.S. v. Rodriguez*,

627 F.3d 1372 (11th Cir. 2010) ..................................................... 59

*U.S. v. Rosa*,

11 F.3d 315 (2d Cir. 1993) ............................................................ 36

*U.S. v. Sanchez*,

24 F.3d 1259 (10th Cir. 1994) ................................................... 36, 37

*U.S. v. Smith*,

148 F. App'x 867 (11th Cir. 2005) ................................................. 37

*U.S. v. Sterling*,

738 F.3d 228 (11th Cir. 2013) ................................................ passim

*U.S. v. Talley*,

431 F.3d 784 (11th Cir. 2005) ....................................................... 70

*Citations primarily relied upon. 11th Cir.R. 28-1(e).

*U.S. v. Tampas,*
  493 F.3d 1291 (11th Cir. 2007) ...................................................... 25

*U.S. v. Valnor,*
  451 F.3d 744 (11th Cir. 2006). ...................................................... 69

*U.S. v. Walls,*
  237 F. App'x 599 (11th Cir. 2007) ................................................ 39

*U.S. v. Williams,*
  468 F.2d 819 (5th Cir. 1972) ........................................................ 25

*U.S. v. Womack,*
  454 F.2d 1337 (5th Cir. 1972) ...................................................... 47

**Federal Statutes**

18 U.S.C. § 3231 ............................................................................. xiii

18 U.S.C. § 3553(a) ............................................................... 70, 71, 72

18 U.S.C. § 3742 ............................................................................. xiii

18 U.S.C. § 4241(a) .......................................................................... 72

18 U.S.C. § 4244(a) .................................................................... 72, 74

*28 U.S.C. § 144 ......................................................................... 46, 47

28 U.S.C. § 455(a) ............................................................................ 49

28 U.S.C. § 1291 ............................................................................. xiii

*Citations primarily relied upon. 11th Cir.R. 28-1(e).

**Federal Rules**

Fed. R. App. P. 4(b)(1)(A) .................................................................. xiii

Fed. R. App. P. 32(a)(5) ..................................................................... 77

Fed. R. App. P. 32(a)(6) ..................................................................... 77

Fed. R. App. P. 32(a)(7)(B)(iii) .......................................................... 77

Fed. R. Crim. P. 12(b)(3) .................................................................... 32

Fed. R. Crim. P. 12(e) ........................................................................ 32

Fed. R. Crim. P. 29 ............................................................................. 63

Fed. R. Crim. P. 43 ....................................................................... passim

Fed. R. Crim. P. 43(c)(1) .................................................................... 50

Fed. R. Crim. P. 59 ............................................................. 23, 31, 44

Fed. R. Crim. P. 59(a) ........................................................................ 31

Fed. R. Crim. P. 59(b)(2) .................................................................... 31

N.D. Ga. Cr. R. 12.1(b) ...................................................................... 32

**Sentencing Guidelines**

*USSG § 3C1.1 ............................................................................. 22, 67

USSG § 3C1.1, cmt. n.4(E) ............................................................. 67

*Citations primarily relied upon. 11th Cir.R. 28-1(e).

No. 13-13444-AA

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEAN-DANIEL PERKINS,
A/K/A DANIEL MATHEWS, A/K/A LJ,

*Defendant-Appellant.*

## STATEMENT OF JURISDICTION

(A)  The district court had subject matter jurisdiction over the underlying criminal case based on 18 U.S.C. § 3231.

(B)  The court of appeals has jurisdiction over this direct appeal from the judgment and sentence of the district court, under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

(C)  While not jurisdictional, the notice of appeal was timely filed on July 29, 2013, within 14 days of the entry of the district court's judgment and commitment order, on July 17, 2013. Fed. R. App. P. 4(b)(1)(A).

(D)  This appeal is from a final judgment and commitment order that disposes of all the parties' claims in this criminal case.

Case: 13-13444 Date Filed: 08/19/2014 Page: 16 of 92

# STATEMENT OF THE ISSUES

1. Whether the district court denied Perkins the right to retained counsel when Perkins asked the court to appoint counsel and never retained one?

2. Whether Perkins waived appellate review of the denial of his motions to suppress evidence by failing to object to the magistrate judge's order, and whether the district court clearly erred in finding a photo lineup was not unduly suggestive and that the witness's identification was otherwise reliable?

3. Whether the district court abused its discretion by failing to recuse where Perkins's *pro se* motion did not meet the statutory requirements and where Perkins showed no external bias?

4. Whether the district court plainly erred by holding trial in Perkins's absence where Perkins waived his right to appear and invited any error by refusing to leave lockup the morning of trial?

5. Whether the district court plainly erred or whether Perkins invited any abrogation of his right to public trial by refusing to leave lockup the morning of trial?

6.  Whether the evidence was sufficient to convict Perkins where several witnesses identified him, and where Perkins's apartment was rented using a stolen name, date of birth, and social security number?

7.  Whether the district court clearly erred in finding that Perkins attempted to obstruct justice, and whether the district court abused its discretion by imposing a 360-month, below-Guidelines range sentence?

8.  Whether the district court abused its discretion by not ordering a competency hearing after Perkins adopted a sovereign-citizen strategy?

Case: 13-13444    Date Filed: 08/19/2014    Page: 18 of 92

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition Below

A grand jury sitting in the Northern District of Georgia issued a superseding indictment charging Perkins with two bank fraud conspiracies, 30 counts of substantive bank fraud, four counts of access device fraud, and one count of aggravated identity theft. (Doc.35.) On June 28, 2011, after a four-day trial, a jury convicted Perkins on all counts. (Doc.178.) The district court denied Perkins's motion for new trial and sentenced him to a total of 360 months' incarceration, five years' supervised release, $510,509.01 restitution, and a $3,700 special assessment. (Docs.311,313.) Perkins, who is currently incarcerated, timely appealed. (Doc.314.)

### B. Statement of the Facts

#### 1. American Express

Perkins fraudulently charged $3 million from American Express. (PSR¶20(a).) Perkins established over two dozen merchant accounts, which are accounts for businesses who wish to accept American Express cards as payment. (Doc.237-133-34,269;Doc.239-613,664,678.) Operating as a merchant, Perkins used stolen and counterfeit American Express card numbers to make fraudulent charges. (Doc.237-269–70;Doc.239-601-602,613,621-624,668–679.)

3

Following the merchant agreement, American Express would
deposit the amounts into Perkins's settlement accounts within days of
Perkins entering the charges. (Doc.239-601–602,613–614,617,621-
624,666,669.) By the time customers questioned the fraudulent
charges, Perkins had drained the settlement accounts. (Doc.238-
305;Doc.239-613,617–618,666–670.)

An American Express investigator compiled records showing
commonalities in the fraudulent merchant accounts. (Doc.238;239-
669–673.) Many used the same telephone number, address, or
settlement account number. (*Id.*) The investigator provided the FBI a
list of fraudulent merchant accounts and the card account numbers
that made fraudulent charges into those accounts. (Doc.239-673–679;
Gov't Ex.161.1.) FBI agents later found each of those merchant
account numbers and compromised American Express card numbers
on computers and thumb drives Perkins possessed when he was
arrested, in a bag he left at a Tampa restaurant, and in his apartment.
(Doc.239-683–706;Gov't Ex.161.2,161.3,162–167.) They also found
correspondence from American Express in the apartment, alerting the
merchant account holder of American Express's attempts to charge
back, or obtain refunds of, fraudulent charges. (Doc.237-269–270.)

Case: 13-13444    Document: 34    Date Filed: 08/08/2014    Page: 20 of 92

American Express is a federally-insured bank. (Doc.239-132.) Perkins's intended loss to American Express exceeded $3 million, with an actual loss over $500,000. (PSR¶20(a).)

### 2. Suntrust

Perkins also attempted to defraud Suntrust bank. (PSR¶20(b);Doc.239-540.) Perkins met at least two Suntrust bank tellers socially, and obtained from them confidential account information, including the names of people authorized to sign withdrawals for high-value Suntrust accounts. (Doc.238-408–427,444–464.) The two insiders identified a picture of Perkins as the person to whom they gave printouts from Suntrust's internal computer system. (Doc.238-319–320,412,447,467;Gov't Exs.177,98.)

Perkins used the confidential account information to pose as the true accountholders and apply for online account access, allowing him limitless transfers online. (Doc.238-379–383,386–393,407.) He also used the confidential information to submit bank forms that disabled security measures on the accounts, so that the bank would no longer seek to confirm the accountholder intended the transfers. (Doc.238-383,389.)

The superseding indictment involved three accounts: Cooper & Company, a family-owned construction company; Ferry, Hayes, and Allen, an architectural firm; and the Georgia Tech Foundation, which

contained over $10 million. (Doc.35;PSR¶31;Doc.238-396–402;468–
471;Doc.239-586–589,647–651;Gov't Ex.98.) Perkins successfully
transferred over $3.5 million from Cooper & Company. (Doc.238-
396–402.) Fortunately, Gail Cooper, who pays the bills for the
company, checks the account daily. (Doc.238-506;509.) When she saw
the large withdrawals, she alerted Suntrust, which was able to reverse
the withdrawals. (Doc.238-399–400;510.)

    Agents found the printouts from Suntrust's internal computer
system in one of Perkins's bags. (Doc.238-314–317,426,466–
467;Gov't Exs.98,133.) Handwritten on the printouts were the names
of people permitted to approve withdrawals for those accounts.
(Doc.238-469,472;Gov't Ex.98.) The printouts identified the Suntrust
employees who accessed the information. (Doc.238-468,470.) The two
bank insiders who printed the information testified at trial and
confirmed that they printed the internal bank information, wrote the
signatories on the printouts, and gave them to Perkins. (Doc.238-408–
427,444–464.) Perkins also had information related to the three
indicted accounts on a USB thumb drive he possessed when arrested,
and on a computer in his apartment. (Gov't Exs.159,160;Doc.239-
540–562.)

Overall, Perkins obtained confidential information for 47 high-value accounts held by 13 depositors, worth over $20 million. (PSR¶20(b).)

### 3. The undercover operation

The FBI set up an undercover operation. (Doc.237-116–117.) An FBI agent posed as a consultant with access to internal bank database information. (Doc.237-117–118.) The agent was introduced to Perkins, who went by the aliases "Daniel Mathews" and "LJ." (Doc. 237-115–119.) The agent and Perkins spoke on the telephone, by email, and by text-message. (Doc.237-119.) Once introduced, the agent told Perkins that he could move money using the bank's internal systems, and Perkins told the agent that he could get the money out of the banks. (Doc.237-132–135.) Perkins's goal was to steal $50 million. (Doc.237-135.) The two consummated a few small trial transactions. (Doc.237-151–154,164–167.)

The agent and Perkins also discussed credit card fraud. (Doc.237-137,144–147.) Perkins told the agent that he had a source for credit card information in Ukraine. (*Id.*) Later, agents found in Perkins's car and apartment receipts for wires to Ukraine. (Doc.237-147,234–237,263–265;Gov't Exs.26-29,90-92.) Internet chat records on a computer Perkins had with him when arrested show Perkins purchasing credit card information from a person in Ukraine, and

7

Case: 13-13444    Date Filed: 08/19/2014    Page: 23 of 92

show information corresponding to a wire receipt found in his apartment. (Doc.239-706,709–724.) A file of stolen Discover card numbers ("200 Disco") was also found on that computer, and on a thumb drive in Perkins's apartment. (Doc.238-523–525;Doc.239-721–722;Gov't Exs.153,154.)

Perkins told the agent that he would put the compromised credit card information onto the magnetic strips of blank credit cards using a MSR206 card writer. (Doc.237-172–174.) A MSR206 was later found in Perkins's apartment, connected with an old serial-to-USB connection just as Perkins had described to the agent; a manual for a MSR206 was found on a thumb drive in Perkins's pocket on arrest. (Doc.237-172–174,191,240–245;Doc.238-525,539;Gov't Ex.155.)

Perkins also told the agent that he purchased camera equipment using stolen card numbers. (Doc.237-153.) The equipment was later found in Perkins's apartment with receipts showing that it was purchased with stolen Discover cards; those card numbers were found on Perkins's electronic media. (Doc.237-266–269;Doc.239-658–659;Gov't Ex.173.) Perkins offered the agent card data as payment. (Doc.237-156,168–171,175–177.)

Eventually, the agent and Perkins met at a Ruby Tuesdays restaurant in Atlanta. (Doc.237-118–119,181–189.) The FBI videotaped and recorded the meeting. (Doc.237-182–192;Gov't

Case: 13-13444 Date Filed: 08/19/2014 Page: 24 of 92

Exs.10,11.) During the meeting, Perkins handed 12 fraudulent credit cards to the undercover agent. (*Id.*;Gov't Ex.12.) When they left the restaurant, Perkins was arrested. (Doc.237-118-119,196.)

On arrest, Perkins possessed two Georgia Driver's licenses, one in the name of Jean-Daniel Perkins, with a number and address that were registered with the Georgia Department of Motor Vehicles. (Gov't Ex.13;Doc.237-224–226.) The other, for which there is no record at Georgia DMV, had the same picture but was in the name Daniel J. Mathews. (Gov't Ex.14;Doc.237-225–226.) He also had around $3,250 cash and 20 counterfeit credit cards in his pocket, some under the Mathews name, but none under the name Perkins. (Gov't Exs.16–19,19.1;Doc.237-227–229.) Perkins also had receipts for more camera equipment he told the undercover agent he purchased with stolen credit card information. (Gov't Exs.23,23-A,23.1,23.2;Doc.237-194,230–233.) The card number on those receipts matched one of the fraudulent cards found on Perkins in the name Daniel Mathews. (Doc.237-233.) The actual equipment was discovered in Perkins's apartment. (Doc.237-194-195,233.) Perkins had a cellular telephone with a number matching the one that the agent used to call LJ. (Gov't Ex.20;Doc.237-197,229–230.) Perkins possessed a USB thumb drive and a computer, which contained data relating to the 12 credit cards Perkins gave the undercover agent.

Case: 13-13444    Date Filed: 08/19/2014    Page: 25 of 92

(Gov't Exs.21,22;Doc.237–230.) At the time of his arrest, Perkins had a computer file over 13,000 pages long, containing at least 100,000 card account profiles. (PSR¶¶20(c),60.) Perkins arrived at the Atlanta Ruby Tuesdays in a black Cadillac Escalade that he drove, but that was registered in someone else's name. (Doc.237-182,211,233–234; Doc.239-598,631–632;Gov't Ex.24.)

During trial, the undercover agent identified the defendant as the person he met at the Atlanta Ruby Tuesdays who handed him the counterfeit cards. (Doc.237-119,189,198;Gov't Ex.177.) The arresting agent also identified the defendant on trial as the person he had arrested, on whom he found the driver's licenses, cell phone, credit cards, computer, and thumb drive. (Doc.237-224,253;Doc.238-303,319–320;Gov't Ex.177.)

### 4.  The Tampa bag

A few months before the undercover operation, employees of a Ruby Tuesdays in Tampa, Florida found a bag that had been left there. (Doc.238-338–339.) A restaurant manager, Matthew Delellis, retrieved the bag from under the table. (Doc.238-339–340.) When he looked inside to find contact information for the owner, he saw numerous credit cards in various names. (Doc.238-340.) Employees called the police, who retrieved the bag. (Doc.238-341.)

10

Case: 13-13444    Date Filed: 08/19/2014    Page: 26 of 92

Later that day a man called asking for a bag he had left. (Doc.238-341–343.) A man and woman then showed up and looked under the table where Delellis had found the bag. (Doc.238-343–344.) He asked Delellis for his bag. (Doc.238-345.) The man left his name, Daniel Mathews, and a phone number. (Doc.238-357–358.) The next day, the police officer who recovered the bag called the number. (Doc.238-358.) The man who answered confirmed that he was Daniel Mathews, and said that his lawyer would be in contact about getting it back. (Doc.238-358.) No one did. (Doc.238-357.)

Within a month, a Tampa FBI agent retrieved the bag and, three weeks later, obtained a search warrant for it. (Doc.83-156,166.) The bag contained fraudulent credit cards, a folder with printouts from the internal Suntrust computer system, a laptop computer, and a hard drive. (Doc.238-313–318;Gov't Ex.129–134.)

At trial, Delellis identified the defendant from a photo array as the man who returned to the restaurant looking for his bag. (Doc.238-346–347;Gov't Ex.178.) He also identified the defendant based on his seeing him at the suppression hearing. (Doc.238-348;Gov't Ex.177.)

### 5.  Gables apartment 1212

After obtaining a search warrant, the FBI searched Gables apartment #1212, 820 West Marietta Street, in Atlanta. (Doc.109-1;Doc.237-237–238;Gov't Ex.30–55.) In the kitchen, agents found a computer

Case: 13-13444  Date Filed: 08/19/2014  Page: 27 of 92

hooked up to a MSR206 card writer through a serial-to-USB connection. (Doc.237-239-243-245.) Also connected to that computer was a USB thumb drive, which computer forensics later showed contained information for the 12 fraudulent cards Perkins gave to the undercover agent. (Doc.238-312;Gov't Ex.128.)

The apartment contained camera equipment corresponding to the equipment Perkins told the undercover agent he purchased using fraudulent cards, and which matched the credit card receipts found on Perkins. (Doc.237-244,267–269;Gov't Exs.93.) Drawers in the apartment contained stacks of fraudulent credit cards, around 400 of them, and there were blank cards as well. (Doc.237-244–248,259–261;Gov't Exs.71–83.) There was an uncashed $72,000 check from Suntrust, not made out to Perkins, and screenshots from Suntrust's internal computer system, including one for Ferry, Hayes, and Allen. (Doc.237-261–262,270–272;Gov't Exs.85,98–99.) There were also checks from Cooper & Cooper. (Doc.237-272–273;Gov't Exs.101,102.) There were letters from American Express regarding merchant accounts, one regarding a disputed $165,000 charge. (Doc.237-269–270;Gov't Exs.96,97.)

The apartment contained an identification-card writer, which can create driver's licenses, as well as failed prints of Ohio Driver's licenses. (Doc.237-247–248,257–260;Gov't Exs.69,70,81.) It also had

Case: 13-13444   Document: 34   Date Filed: 08/19/2014   Page: 28 of 92

credit card swipers that merchants use, and wire receipts showing transfers to Ukraine in the same names as was on the Internet chats on Perkins's computer when he was arrested. (Doc.237-255–256,263–265;Gov't Exs.65,66,90–92.)

Gables records show that Apartment 1212 was leased by Lisa Evans. (Doc.237-238,274.) The Gables' leasing file for Apartment 1212 contains a copy of an Ohio driver's license in that name, and the application contains Evans's date of birth and social security number. (Doc.237-274–276;Gov't Ex.115.) The lease paperwork shows that the company ran credit and other history information on Evans. (Gov't Ex.115.) Inside the apartment was correspondence addressed to Lisa Evans from Gables informing the occupant of unpaid bills, as well as from an insurance company related to renter's insurance. (Doc.237-277;Gov't Exs.108-112.)

Lisa Evans testified at trial that she has lived at the same residence in Dallas, Georgia for the past 14 years. (Doc.238-333.) She has never rented an apartment in Atlanta. (Doc.238-334.) The lease paperwork and driver's license show her true date of birth and social security number, but she has never had an Ohio's driver's license. (Doc.238-336.) And she is not pictured on the Ohio license. (Doc.238-337.) While the driver's license shows a picture of an African-American woman, Ms. Evans is caucasian. (Doc.237-276–277.)

13

Case: 13-13444    Date Filed: 08/19/2014    Page: 29 of 92

While the one-bedroom apartment was leased in the name of Ms. Evans, only men's clothes were in the closets. (Doc.237-247.) The apartment contained a birth certificate from Louisiana for Jean-Daniel Perkins. (Doc.237-250–251.) The only other birth certificate was blank. (Doc.237-250–252.) Perkins was born in New Orleans. (Doc.237–251.) John Sorden, a co-defendant, testified that Perkins lived in the apartment with his girlfriend. (Doc.239-628,638,639.) Sorden also identified Perkins from a photo at trial, and testified that Perkins went by the names Jean, LJ, and Daniel Mathews. (Doc.239-593;Gov't Ex.177.)

The apartment contained a Sam's Club card with a picture of Perkins, and a fake Ohio driver's license with a picture of Perkins but in a different name. (Doc.237-249,252-253;Gov't Exs.58,61–63.) There was an ASCAP music application in the name of Perkins, and a Delta Air Lines boarding pass in his name. (Doc.237-253–254;Gov't Ex.64,105.) The only photo album in the apartment had photos of Perkins. (Doc.237-249–250;Gov't Ex.56.) There were also documents related to his Escalade. (Doc.237-254–255;Gov't Exs.106,107.) Finally, the apartment contained the lease agreement to Perkins's old apartment, the same address as was found on Perkins's driver's license when he was arrested. (Doc.237-171;Doc.238-307–308;Gov't Exs.13,114.)

14

### 6. Suppression motions

Perkins's first counsel filed preliminary motions to suppress evidence and identifications. (Docs.19,21,15.) The United States represented that it would not present evidence from a computer turned in by a confidential informant, thus mooting that issue. (Doc.83-199–200;Doc.109-2n.3.)

When ordering a post-hearing briefing schedule, the magistrate judge told Perkins's second counsel to brief the issues he wished perfected, and that the remaining issues would be deemed abandoned. (Doc.83-202.) Perkins's post-hearing brief argued that the out-of-court identifications should be suppressed, and that a new hearing should be held to determine whether the search warrants were tainted by those identifications. (Doc.92-4–8.) Perkins argued no other issues. (*Id.*) Accordingly, the magistrate judge recommended that Perkins's motions to suppress evidence be deemed waived, and moot. (Doc.129-2–4.) The magistrate judge recommended denying Perkins's motion to suppress out-of-court identifications. (Doc.129-14–23.) Because the identifications passed muster, the magistrate judge recommended no further hearings regarding the search warrants. (Doc.129-23.)

Perkins objected only to the denial of his motion to suppress identifications. (Doc.134-1.) In his objections, Perkins did not argue

15

that the contents of the Tampa bag, his apartment, and his various electronic media should be suppressed, nor that a further hearing was warranted as to the search warrants because of purportedly improper identifications. (Doc.134-1–3.) The district court adopted the Report and Recommendation. (Doc.145.)

At trial the United States presented identification evidence from only one of the four witnesses at issue in Perkins's motion. Mr. Delellis, a manager at the Tampa Ruby Tuesdays, testified that he got a good look at Perkins and was able to identify him fairly quickly from a pretrial photo array, with 98% confidence. (Doc.238-345–349.) On cross-examination, defense counsel suggested that Perkins was the only person with gold teeth in the photo array, but Delellis pointed out that at least two of the six had their mouths closed, so he was not sure if those men also had gold teeth. (Doc.238-50–51.) Delellis also testified at trial, without objection, that he saw Perkins during the suppression hearing, and that Perkins was the person he saw in the Tampa Ruby Tuesdays seeking the bag. (Doc.238-348;Gov't Ex.177.)

### 7. Refusal to attend trial

The Friday before trial, the district court held a pretrial conference. (Docs.157,253.) After pages of sovereign-citizen jargon, Perkins became angry, and began talking over the court, making it impossible to speak in the courtroom. (Doc.253-24–41;Doc.313-7–11.) The court

Case: 13-13444    Document: 34    Date Filed: 08/08/2014    Page: 32 of 92

met counsel in chambers to discuss how to proceed should Perkins continue his outbursts during trial and have to be removed. (Doc.253-43–49;Doc.313-11.)

The morning of trial, Perkins refused to leave Marshal's lockup. (Doc.236-2–4-;Doc.313-11–12.) When the court sent a deputy marshal to see if Perkins would appear, Perkins told the deputy that they were "going to have to beat me," that he would "be kicking and screaming to go into the courtroom," and "if it's on, it's on." (Doc.236-26-27;Doc.313-12–13.) Perkins stood with his back all the way against the wall, his voice level rose, getting increasingly excited. (Doc.236-27;Doc.313-13.)

After consulting with defense counsel and prosecutors, and given Perkins's resistance, the judge, court reporter, defense counsel, and a prosecutor visited Perkins in lockup to explain his rights. (Doc.236-3-20,24–38;Doc.313-13.) When the court entered lockup, Perkins "immediately became violent, kicking so hard against the door that the deputy marshals became alarmed and opened the door to remove him." (Doc.313-13;Doc.236-39.) The court ordered them not to. (*Id.*) While the judge explained his rights, Perkins talked over her the entire time. (Doc.236-39–46;Doc.313-14.) The court explained that she wished Perkins would come to the courtroom, but otherwise he could watch the trial from lockup. (*Id.*) Perkins loudly repeated, "I

17

don't understand. I don't agree" the entire time. (Doc.236-39–
46;Doc.313-14–15.)

The court returned to the courtroom, where the court repeated
Perkins's rights while Perkins watched and listened to a live audio-
video feed. (Doc.236-46–48;Doc.313-15.) The judge let Perkins know
she would ask counsel to visit him during the day to consult, and that
Perkins would have a pen and notepad. (Doc.236-47–48.) Defense
counsel voiced no objection to either the visit to lockup nor to these
procedures. (Doc.236.) The next morning, after jury selection, Perkins
still refused to attend, counsel said that he objected to the video feed
and other procedures, but he made no suggestion other than wanting
trial stopped. (Doc.237-58–59.)

During trial, the court asked defense counsel to visit Perkins
during breaks, and otherwise consulted with counsel about the proper
way to proceed. (Doc.237-59,67–68;Doc.238-287–
288,394,531;Doc.239-535–536,644–645,727.) When the prosecutor
raised the possibility of bringing Perkins to court for an identification,
defense counsel noted that "it's my job to keep the prejudice down if I
can," and suggested that the FBI agent who acted undercover could
identify Perkins from a picture. (Doc.237-130.) When a deputy later
offered to use extra manpower to bring Perkins to the courtroom,
defense counsel observed: "I don't think having [Perkins] forced to

court and having extra security, I think that's going to prejudice him more than not being here." (Doc.238-291.)

At the close of evidence, defense counsel moved for acquittal on the aggravated identity theft count on the basis that the evidence did not show Perkins knew Lisa Evans, and that the evidence showed that other people had access to the apartment. (Doc.239-730.) Otherwise, defense counsel argued solely: "And as to the other counts, we would move for a judgment of acquittal on the grounds that the government has not created a prima facie case of conspiracy or that Mr. Perkins is guilty of the substantive counts." (*Id.*)

### 8. Jail calls

On jail calls before and during trial, Perkins, his mother, and his brother discussed Rule 43 of the Federal Rules of Criminal Procedure, regarding a defendant's presence at trial. (Doc.309(1)-108–123.) Perkins discovered that "trial cannot commence ... without the presence of the defendant." (Doc.309(1)-22;Doc.313-17.) Perkins asked his family to research the legal terms "presence" and "absence," and they discussed Rule 43 and various case law, including the Supreme Court's *Crosby* decision; Perkins even provided citations for them to review. (Doc.309(1)-108–123,105–107;Doc.313-17.) Perkins explained that not being present at the beginning of trial is "a major

loophole." (Doc.309(1)-120.) According to Perkins, what he needed to

do the morning of trial was act crazy:

> Oh, okay. I got it. I got to go straight plumb nuts before they
> even pick the jury. That's what I gotta do. I gotta go haywire on
> that bitch.
> ....
> Oh, okay. So I gotta be ... plumb nuts before the shit even pop
> up. Don't never ... don't never act sensible.
> ...
> That's how you gotta do it. "Who said I want to go trial. I don't
> want to go to no mother fucking trial. I don't want no jury trial
> ... How you gonna make me have a jury. ...This shit ain't
> popping off, you mother fucking bitch...." And just go crazy on
> that mother fucker.
> ....
> Yeah. I need to get that down. Okay. You bitches want to play
> games. This shit going to get real zoo-like.

(Doc.309(1)-26–27;Doc.313-17–18.) Perkins recognized that once trial

started the judge can remove him. (Doc.309(1)-57;Doc.313-19.) He

acknowledged that "presence is the most essential thing I see they

need...." (Doc.309(1)-48;Doc.313-19.)

   After the court visited Perkins in lockup, Perkins boasted to his

family that he outsmarted everyone:

> I went cold turkey on them bitches this morning. You hear me?
> ...

20

Case: 13-13444    Document: 34    Date Filed: 09/19/2014    Page: 36 of 92

I didn't even go out there … [T]he judge kept sending people up there…trying to beg me to come down there and … talk on the record… I was like, no, fucker.

…

So, I kept on saying…and it was recorded and I kept saying it loud, talking over. I kept saying I do not understand. I don't agree. I do not understand. I do not understand.

(Doc.309(1)-65–66;Doc.313-20–22.)

Perkins said that he found the way to avoid punishment:

 [M]a, I'm going to give you…I'm going to give you the game right now. I figured it out. You ever get a charge…don't go to court. Don't…Don't [unintelligible]. When they get you in the building, you not, you not going in that bitch.

…

 [T]he book says that trial doesn't start until you…until…until you are in the court…until you…until you present. That's why I had you looking up all that shit (untelligible) for until you are present. And once you are present, right, you have to be present when the first juror is sworn in and go to…I never…you have to be in the court and cross the bar. I never…I'm not…that's my new thing. I ain't going to court. When I get out of this mother fucker, I ain't going to no court no more…I'm not even crossing the bar.

…

Yeah. I feel why this shit is so dangerous here, ma. I see why everybody ain't supposed to know this shit though.

…

I see why. I going to have more of a respect for it though, you know what I'm saying. Because that shit could fuck the whole … this shit could fuck the whole system up, man. This shit could go crazy, man.

(Doc.309(1)66,77–78;Doc.313-22.)

After the verdict, Perkins moved for a new trial claiming a violation of Rule 43, requiring his presence at the beginning of trial. (Doc.190.) In a 56-page order, the district court denied Perkins's motion, finding that trial commenced in lock-up, Perkins waived his presence, and that he invited any error. (Doc.313.)

### 9. Sentencing

Perkins did not object to the facts in the PSR. (PSR¶¶19–70,86–145.)

Perkins was arrested 19 times between the ages of 7 and 14. (PSR¶¶95–114;Doc.326-45,52,59.) His adult record includes possession of crack and another federal fraud conviction, in total earning him a criminal history category of IV. (PSR¶¶87–90.) The PSR recommended a Guidelines range of life plus 24 months. (PSR-45.)

Perkins refused to appear for sentencing. (Doc.326-2–8,11–18.) When the court tried to see him in lockup, he hid in the bathroom. (Doc.326-4–6,11–18.) So the court broadcast sentencing to him through live audio-video. (Doc.326-4–6,18–20.) Over objection, the court assessed Perkins a two-point enhancement under USSG § 3C1.1 for attempting to obstruct justice. (Doc.326-21,36,41–42.) The district court upheld much of Perkins's objections as to loss, and calculated Perkins's Guidelines range as 360–life, plus a 24-month

22

mandatory minimum consecutive sentence for aggravated identity theft. (Doc.326-21–32,41–44,57–58.) The court concurred with the government's recommendation to vary downward, imposing a total sentence of 360 months' incarceration. (Doc.326-22,54,58–62.)

The district court explained that it would have imposed a 360-month sentence regardless of the Guidelines range: "So I will say when I ultimately sentence that wherever that Guideline is I would give the same sentence anyway." (Doc.326-58.) It also explained that it had never had a fraud case this extensive, and that it hadn't "seen anybody that has a less compliant attitude toward the law or less regret than Mr. Perkins." (Doc.326-59.) The court concluded that "society would be in grave danger with a sentence that wasn't sufficiently long." (Doc.326-61.)

**C. Standards of Review**

1. "When a party invites error, the Court is precluded from reviewing that error on appeal." *U.S. v. Brannan,* 562 F.3d 1300, 1306 (11th Cir.2009).

2. The failure to object to a magistrate's report and recommendation waives appellate review. Fed. R. Crim. P. 59. A district court's determination that an identification procedure was not unduly suggestive is reviewed for clear error. *Cikora v. Dugger,* 840 F.2d

893, 895–96 (11th Cir.1988). When a party fails to object to evidence, review is for plain error. *U.S. v. Jernigan,* 341 F.3d 1273, 1280 (11th Cir.2003).

3. The denial of a motion to recuse is reviewed for abuse of discretion. *U.S. v. Berger,* 375 F.3d 1223, 1227 (11th Cir.2004). If a party fails to seek recusal below, the recusal request is reviewed for plain error. *Id.*

4. The district court's interpretation of a procedural rule is reviewed *de novo. U.S. v. Sterling,* 738 F.3d 228, 234 (11th Cir.2013). The district court's factual finding that a defendant voluntary waived his presence is reviewed for clear error. *Id.* This Court "consider[s] whether the district court abused its discretion in concluding that there was on balance a controlling public interest to continue the trial in the defendant's absence." *Id.* Where the defendant does not timely object, a district judge's decision to continue trial in his absence is reviewed for plain error. *U.S. v. Martinez,* 604 F.2d 361, 365 (5th Cir.1979).

5. Where a defendant does not object at trial, the denial of a public trial is reviewed for plain error. *U.S. v. Bucci,* 525 F.3d 116, 129 (1st Cir.2008).

Case: 13-13444 Document: 34 Date Filed: 08/08/2014 Page: 40 of 92

6. Where a sufficiency challenge is not raised below, review is limited to whether the convictions resulted in a manifest miscarriage of justice. *U.S. v. Houser*, — F.3d —, 2014 WL 2767200, at *11 (11th Cir.2014).

7. A district court's fact findings regarding a sentencing enhancement are reviewed for clear error, and its application of the Guidelines *de novo. U.S. v. Tampas*, 493 F.3d 1291, 1303 (11th Cir.2007). The Court reviews the substantive reasonableness of a sentence for abuse of discretion. *U.S. v. Pugh*, 515 F.3d 1179, 1190 (11th Cir.2008).

8. This Court reviews the district court's decision not to *sua sponte* order a competency hearing for abuse of discretion. *U.S. v. Lindsey*, 339 F. App'x 956, 959 (11th Cir.2009); *U.S. v. Williams*, 468 F.2d 819, 820 (5th Cir.1972). The Court reviews a district court's determination that a defendant is competent to stand trial for clear error. *Ferguson v. Sec'y for Dep't of Corrections*, 580 F.3d 1183, 1221 (11th Cir.2009).

Case: 13-13444    Document: 34    Date Filed: 08/29/2014    Page: 41 of 92

# SUMMARY OF THE ARGUMENT

The district court did not force appointed counsel on Perkins. Perkins requested appointed counsel at his initial appearance, and never retained counsel.

By not objecting to the magistrate's judge's recommended denial of his motions to suppress evidence, Perkins waived appellate review. Perkins objects to certain out-of-court identifications, but of those only one witness identified Perkins at trial. The district court did not clearly err in finding that the witness was not shown an unduly suggestive photo lineup, and in any case provided a reliable identification. Plus any error was harmless. The district court did not plainly err by allowing that witness to identify Perkins from a prior court hearing.

The district court did not abuse its discretion by not recusing. Perkins failed to obey the statutory requirements, and the judge had no bias external to the case.

Controlling precedent holds that the district court did not err in proceeding with trial when Perkins refused to attend.

The district court did not plainly err by convening trial in lockup. And by refusing to leave lockup, Perkins invited any potential violation of the right to public trial.

Case: 13-13444    Document: 34    Date Filed: 08/19/2014    Page: 42 of 92

The evidence supports conviction. Despite Perkins's refusal to attend, several witnesses identified him as the defendant, including the undercover agent who met Perkins, another who arrested him, and several cooperating co-conspirators. The use of a fraudulent driver's license that included the victim's name, date of birth, and social security number to lease an apartment supports Perkins's conviction for aggravated identity theft.

The district court did not abuse its discretion in sentencing Perkins. The district court did not clearly err in concluding that Perkins attempted to obstruct justice by refusing to appear, and by his other manipulative efforts to impede trial.

The district court did not abuse its discretion by not ordering a competency hearing. Perkins led some of the more complex fraud in this district, and the evidence, including his jail calls, show him to be intelligent, coherent, and articulate. His sovereign-citizen mantras were not the result of incapacity, but a purposeful effort to manipulate the justice system.

Case: 13-13444    Date Filed: 08/19/2014    Page: 43 of 92

## ARGUMENT AND CITATIONS OF AUTHORITY

1.  **Because Perkins requested appointed counsel, and swore to a financial affidavit showing that he could not afford one, he invited the district court to appoint counsel.**

At his initial appearance, Perkins specifically requested appointed counsel, and swore to a financial affidavit showing that he was unable to afford an attorney:

> The Court: You may hire your own attorney or, in the event you are not able to afford an attorney, the Court may appoint someone to represent you at no cost to you.
>
> It is my understanding that you would like for the court to appoint someone to represent you and that you are not able to afford an attorney, is that correct?
>
> The Defendant: Yes, Ma'am.
>
> The Court: Okay. To that extent you have completed a financial affidavit. Do you either swear or affirm that the information provided in the affidavit is true to the best of your knowledge?
>
> The Defendant: Yes, Ma'am.
>
> The Court: Okay. Based on this information the Court will deem that you are not able to afford an attorney and the Court will appoint [one].

(Doc.335-3;PSR¶144.) Perkins did not object to the court's finding of indigency at the initial appearance, nor when the court later issued its

28

Order Appointing Counsel. (Doc.2.) Because Perkins invited the court to appoint counsel, this Court is precluded from reviewing the issue on appeal. *U.S. v. Brannan*, 562 F.3d 1300, 1306 (11th Cir.2009) (holding that "[w]here a party invites error, the Court is precluded from reviewing that error on appeal.").

The record does not support Perkins's claim, made for the first time on appeal, that he could afford counsel and was deprived of his right to retain one. The record does not show that Perkins hired counsel, and no retained counsel entered an appearance. Neither does the record show any changed financial circumstances. Perkins never filed a revised financial affidavit, nor did he or his counsel otherwise represent that he could afford counsel. The PSR includes Perkins's financial statement to pretrial services after his arrest, and shows an unverified net worth of $7,500. (PSR¶144.) Neither Perkins nor his counsel objected to this paragraph of the PSR.

When Perkins filed an appeal, this Court found that, "Perkins has established poverty by way of an affidavit of indigency." (Doc.250-1.) Perkins then swore to this Court that he was unable to pay a filing fee. (Doc.287-1–2.) To this day, Perkins maintains appointed counsel. Perkins's appellate counsel was appointed under the CJA, and neither Perkins nor appellate counsel has indicated that she should forego her CJA appointment based on Perkins's financial status.

29

Case: 13-13444    Document: 34    Date Filed: 08/08/2014    Page: 45 of 92

Perkins's *pro se* pleadings, most of which he filed after trial, as well as the pretrial hearing where he asserted that he is "not indigent, not a ward," were part of his sovereign-citizen strategy. Perkins cites no pleading or hearing where he or his counsel say that Perkins retained counsel or wished to do so. While defense alludes to a conflict, the defense does not argue on appeal that a different CJA attorney should have been appointed. (Def. Br. at 21–22.) And the record shows that despite being given a number of opportunities, Perkins never asked to represent himself. (Docs.143,151,253-24–41.) While Perkins complains that the district court did not further explore the claimed conflict, defense counsel explained to the trial court that it stemmed from Perkins threatening to file lawsuits and liens against him. (Doc.253-33.) The record does not show any lawsuits or liens were filed, and in his jail calls Perkins explained that he filed none because counsel had done what he told him to do. (Doc.309(1)-18,99.) Moreover, a defendant's threatening to file liens cannot alone create a conflict; otherwise a defendant could repeatedly delay trial proceedings, as Perkins was trying to do, merely by making such threats.

In short, after asking for appointed counsel, Perkins declared himself a sovereign-citizen and implemented a strategy of trying to avoid trial by declining all of the available options: he did not hire

Case: 13-13444 Date Filed: 08/19/2014 Page: 46 of 92

counsel, he did not want appointed counsel, and he did not want to represent himself.

**2. By failing to object to the R&R, Perkins waived appellate review, and the district court did not clearly err in finding that the witness who identified Perkins at trial did not do so on the basis of an unduly suggestive photo lineup.**

Perkins objected to the magistrate judge's recommending denial of his motion to suppress identifications, but did not object to the denial of his motions to suppress evidence, nor did he argue for a further hearing as to the search warrants. The district court adopted the R&R.

### A. Perkins waived appellate review of his motions to suppress evidence by failing to object to their denial in the R&R.

The cover sheet of the R&R specifically advised the parties that objections were due within 14 days, and that, the failure to object waives a party's right to appellate review. (Doc.129-25-26.) Rule 59 provides that a party's failure to timely file specific written objections to a magistrate judge's report and recommendation waives review. Fed. R. Crim. P. 59(a),59(b)(2). While Perkins objected to the recommended denial of his motion to suppress identifications, he did not object to the denial of his motions to suppress evidence. Because Perkins did not object to the denial of his motions to suppress evidence, he has waived appellate review.

31

Case: 13-13444    Date Filed: 08/19/2014    Page: 47 of 92

Perkins argues that his preliminary motion to suppress sufficed to satisfy the magistrate's instruction during the evidentiary hearing that Perkins must brief the issues he wished to pursue, and would be deemed to have abandoned the rest. Not true. By the evidentiary hearing, Perkins had already waived any suppression issues outside of those in his preliminary motions to suppress. (Fed. R. Crim. P. 12(b)(3),12(e);N.D.Ga.Cr.R.12.1(b) (requiring suppression issues be raised within 14 days of arraignment).) The magistrate's order, at the end of the evidentiary hearing, required further briefing in order to perfect the issues raised in Perkins's preliminary motions. Perkins's argument leaves unanswered what other issues Perkins thinks the magistrate judge was referring to other than the issues he raised in his preliminary motions to suppress. Regardless, Perkins's argument fails in light of his separate waiver of appellate review because of his failure to specifically object to the recommended denial of his motions to suppress evidence.

Perkins complains that the district court admitted into evidence the laptop computer found in the Tampa bag, and asserts that the government represented during the suppression hearing that it would not rely on the Tampa evidence at trial. Perkins is mistaken. At the suppression hearing, the government explained that it intended to introduce the contents of the Tampa bag, including the laptop

Case: 13-13444    Date Filed: 08/19/2014    Page: 48 of 92

computer and the data found on it, and represented that it would not
introduce a different laptop computer, the computer which a
confidential informant gave to the FBI:

> The Court: ... But what the government has said they are not
> going to use is that they're not using evidence obtained from
> the laptop.
>
> [Defense counsel]: And which laptop is that; Judge?
>
> The Court: I'm assuming that's the laptop that was found in
> the bag in Tampa; is that correct?
>
> [Prosecutor]: No, Your Honor.
>
> The Court: Oh.
>
> [Prosecutor]: We are using the laptop in the bag in Tampa. We
> are not using the laptop that Mr. Whitfield [the informant]
> provided in early November.
>
> The Court: Okay.
>
> [Prosecutor]: That was the subject — I think both laptops were
> the part of the same motion to suppress.
>
> The Court: Okay. Because you just said laptop when you
> started off.

[Prosecutor]: My apologies. Docket entry number 51 [Perkins's supplemental motion to suppress evidence] talks about both the Tampa laptop and the laptop Mr. Whitfield provided. We are not going to use evidence from the laptop Mr. Whitfield provided, but we will use evidence from the laptop that was found in the bag in Tampa.

...

In the bag was electronic storage media, the laptop, and an external hard drive ... We plan to use evidence from both of those storage media.

(Doc.83-199–200;Doc.109-2n.3.)

The government held true to this representation. It was defense counsel who, during cross-examination of government witnesses, referred to the laptop given to the FBI by the informant. (Doc.238-326–327;Doc.239-574;Doc.238-331.) Nowhere at trial does defense counsel complain of any misrepresentation by the government. Because the United States did not violate any representation it made during the suppression hearing, and because Perkins did not object to the magistrate's order, Perkins waived review of the denial of his motions to suppress evidence.

## B. The district court did not clearly err by finding that the photo array was not unduly suggestive, and that the restaurant manager who saw Perkins reliably identified him.

Perkins complains that the district court erred by denying his motion to suppress four out-of-court identifications. Of these, only one was

introduced at trial, that of the manager of the Tampa Ruby Tuesdays where Perkins left his bag.

"[R]eliability is the linchpin in determining the admissibility of identification evidence." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977). This Court uses a two-step analysis to determine whether the admission of an out-of-court identification violates due process. *U.S. v. Diaz,* 248 F.3d 1065, 1102 (11th Cir.2001). First, a court must determine if the original identification procedures were unduly suggestive. *Id.* If so, the identification may still be admissible if, under the totality of circumstances, the identification was nonetheless reliable. *Id.* The district court did not clearly err in finding that the photo lineup shown to the restaurant manager was not improperly suggestive, and that in any case the identification was sufficiently reliable.

1. **The district court did not clearly err in adopting the magistrate judge's finding that the photo lineup was not unduly suggestive.**

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside ... only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *O'Brien v. Wainwright,* 738 F.2d 1139, 1140 (11th Cir.1984) (citation omitted). When determining whether a photo

35

Case: 13-13444 Date Filed: 08/19/2014 Page: 51 of 92

array is unduly suggestive, a court considers the size of the array, the manner of its presentation, and details of the photographs themselves. *U.S. v. Sanchez,* 24 F.3d 1259, 1262 (10th Cir.1994); *U.S. v. Rosa,* 11 F.3d 315, 330 (2d Cir.1993).

As the magistrate judge found, the size of the array, here six photos, militates in favor of a finding that the photo array was not unduly suggestive. (Doc.129-15.) *See, e.g., Rosa,* 11 F.3d at 330 (affirming as not unduly suggestive an array of six photographs). Nor was there anything suggestive about the manner in which the photo array was presented. (Doc.129-15). Restaurant manager Delellis testified that the law enforcement officer did not suggest or indicate which picture should be selected; the officer simply asked whether he recognized anyone on the page. (Doc.129-15;Doc.83-117,120,127.) *See U.S. v. Knight,* 382 F. App'x 905, 907 (11th Cir.2010) (concluding that procedure was not unduly suggestive where officer asked witness to identify any individual he recognized in the array and explain what event that person was associated with). The photographs themselves each show men facing forward in the center, from the neck upwards, with differing amounts of contrast in each photo. (Gov't Ex.178;Doc.129-16.)

Perkins notes that his was the only picture of a person with gold teeth. But as the magistrate judge found, that fact alone did not make

the photo lineup unduly suggestive. (Doc.129-16–17.) A lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others. *U.S. v. Smith,* 148 F. App'x 867, 874–75 (11th Cir.2005) (citing *Cikora,* 840 F.2d at 896–97). The other people pictured need not look nearly identical to the defendant for the lineup to pass constitutional muster. *Cikora,* 840 F.2d at 896–98; *Knight,* 382 F. App'x 905, 907 (11th Cir.2010) (holding that photo lineup was not unduly suggestive where it depicted six African-American males of similar age and build, even those the defendant was of lighter complexion and the background lighting was slightly different). Here, the photos were of men with the same gender, appeared to be of the same race, appeared to be roughly the same age, had similar hair length, skin tone, and for the most part, similar facial shape. (Doc.129-17;Gov't Ex.178.)

Moreover, it is not apparent from the photographs that only one of the six men has gold teeth. (Gov't Ex.178;Doc.129-17–18.) Delellis testified that in two of the pictures, the mouths looked shut, and so he could not tell which men had gold teeth. (Doc.83-126–27;Doc.238-350–352.) *See e.g., Sanchez,* 24 F.3d at 1261 (not unduly suggestive where defendant was the only person with eyes closed); *U.S. v. Ricks,* 817 F.2d 692, 697 (11th Cir.1987) (holding, with reservations, that photo array in which defendant was the only person wearing

37

Case: 13-13444 Date Filed: 08/19/2014 Page: 53 of 92

eyeglasses was not unduly suggestive); *Jones v. Smith*, 772 F.2d 668, 671–72 (11th Cir.1985) (holding not unduly suggestive a lineup where defendant was the shortest person pictured, after eyewitness previously described defendant as short).[1]

In contrast, cases in which this Court has found pre-trial identification procedures to be impermissibly suggestive involved photo lineups far more suggestive than the one here. *See Marsden v. Moore*, 847 F.2d 1536, 1545 (11th Cir.1988) (showing photo lineup with defendant as the only male pictured); *O'Brien v. Wainwright*, 738 F.2d 1139, 1140–41 (11th Cir.1984) (showing all black and white mugshots, except for one color photograph of the defendant); *Jones v. Newsome*, 846 F.2d 62, 63–64 (11th Cir.1988) (showing two photo arrays with the defendant's photo in each, with the defendant's photo being markedly different than the others).

### 2. The district court did not clearly err in adopting the magistrate judge's finding that the identification was sufficiently reliable.

Even if the photo array were unduly suggestive, the district court and magistrate judge did not clearly err by finding that Delellis's

---

[1] On cross-examination, Delellis testified that he thought that he was shown a color photo array. (Doc.238-351.) But the original photo array was put in evidence, and it is black and white. (*Id.*(Prosecutor representing that the witness was shown the original, which is black and white);Gov't Ex.178.)

Case: 13-13444   Document: 34   Date Filed: 08/08/2014   Page: 54 of 92

identification of Perkins was nevertheless reliable. For an identification to be unconstitutionally unreliable, there must be a substantial risk of misidentification. *U.S. v. Walls,* 237 F. App'x 599, 601 (11th Cir.2007) (citing *Johnson v. Dugger,* 817 F.2d 726, 729 (11th Cir.1987)). In determining reliability, the court considers: "the opportunity of the witness to view the [defendant] at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the [defendant], the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation." *Manson,* 432 U.S. at 114, 97 S. Ct. at 2253; *Neil v. Biggers,* 409 U.S. 188, 93 S. Ct. 375 (1972).

The court did not clearly err in finding that Delellis's identification was reliable. Delellis had a good opportunity to observe Perkins. Perkins and a female companion stayed at the restaurant for "five minutes or so" and Delellis, along with his manager, "intercepted" them and had a "fairly [] brief conversation" about the bag. (Doc.83-114–116.) Delellis was only about four or five feet from Perkins, was looking directly at Perkins, and got a good look at Perkins's face. (Doc.83-115.)

Given the unusual circumstances surrounding the bag, Delellis paid attention to Perkins when he returned that evening. (Doc.83-109–113,129.) Also, while Delellis did not give law enforcement a

39

Case: 13-13444    Date Filed: 08/19/2014    Page: 55 of 92

description of Perkins before reviewing the photo array, he provided a
description to his manager, and others, which included that the
person who returned looking for the bag had gold teeth. (Doc.83-
117,124–125.) At the evidentiary hearing, Delellis had a concrete
memory about Perkins's features and characteristics in addition to the
gold teeth, including that Perkins stood slightly shorter than Delellis
and was "stocky." (Doc.83-115–116.) Delellis identified Perkins only
three weeks after he met Perkins, while his memory of Perkins "was
pretty fresh in [his] mind." (Doc.83-128.) He was able to identify
Perkins in the array "fairly quickly," and was "about 98 percent"
confident in his selection. (Doc.83-118–120.) The five factors support
judge's findings that Delellis's identification of Perkins was sufficiently
reliable.

### 3.  Any error was harmless.

Admission of the out-of-court identification was, at most, harmless.
The bag Perkins left at Ruby Tuesdays contained credit cards in
various names, and confidential Suntrust printouts which bank
insiders testified they gave to Perkins. One insider testified that
Perkins told her that he had lost the information she had given him
in Tampa. When he returned looking for the bag, Perkins gave the
name "Daniel Mathews" and answered to that name when a Tampa
police officer called him about the bag. On arrest, Perkins had a fake

Case: 13-13444 Date Filed: 08/29/2014 Page: 56 of 92

Georgia Driver's license for "Daniel J. Mathews" in his pocket. Several other witnesses identified Perkins as Daniel Mathews and as the person who committed the charged frauds. Delellis's identification of Perkins was harmless beyond a reasonable doubt.

### C. The district court did not plainly err by allowing Delellis to identify Perkins at trial based on his appearance at an earlier court hearing.

At trial, the restaurant manager also testified, without objection, that he saw the person who returned to retrieve the bag at a "prior hearing," that is, the suppression hearing. (Doc.238-348;Gov't Ex.177.) On appeal, Perkins argues that this in-court identification was reversible error because Perkins was not present at trial, and because Delellis did not identify Perkins at the suppression hearing. (Def. Br. at 29–30.) Because Perkins did not object to this testimony at trial, review is for plain error. *U.S. v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir.2003).

First, there was no error. Perkins's argument that the in-court identification was the result of an unduly suggestive line-up merely repeats the argument above. Perkins complains that the restaurant manager did not identify him at the suppression hearing, but to the extent that establishes error, which it does not, Perkins invited it. At the start of the suppression hearing, and then again when Delellis was called, Perkins moved to be absent for witness testimony, arguing that

any identification during that hearing would be suggestive. (Doc.83-8–10,101–102.) The magistrate judge denied Perkins's request to be removed. (Doc.83-10,102.) Given Perkins's objection, the prosecutor avoided asking the witnesses to identify Perkins at the hearing; to the extent the lack of identification was potential error, Perkins invited it.

In any case, Perkins cites no case law forbidding a later identification. On appeal, Perkins argues that, "There is no evidence that Mr. Delillis [sic] even saw the defendant [at the earlier hearing] or knew who he was." (Def. Br. at 29–30.) To the contrary, the record shows that Perkins was present during the suppression hearing where Delellis testified, and Delellis's testimony at trial confirms that he saw Perkins there. (Docs.83,238-348.) And as with the pretrial identification, the restaurant manager had a reliable basis to identify Perkins.

Second, Perkins cites no statute or controlling case law establishing that the district court cannot admit identification testimony under these circumstances. In fact, Perkins's argument does not cite any statute or case law at all. (Def. Br. at 29–30.) Perkins thus fails to carry his burden of showing the purported error was plain. *U.S. v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir.2003) ("[W]here the explicit language of a statute or rule does not specifically resolve an issue,

there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it.").

Third, for the same reasons the pre-trial identification was harmless, Perkins cannot establish the trial identification affected his substantial rights. Several other witnesses identified Perkins, including the undercover agent, the agent who arrested Perkins, and several co-conspirators. When arrested, Perkins had a fake driver's license with the name "Daniel Mathews," matching the name he gave in Tampa, and the bag contained evidence matching evidence on Perkins's other electronic devices, and linking Perkins to each of the frauds. Delellis's in-court identification was, at most, cumulative.

Likewise, the ample other identification and other evidence in this case show that there is no reason to question the fairness, integrity, or reputation of the judicial system based on the restaurant manager's identification of Perkins from the prior hearing. Perkins cannot establish that the district court plainly erred by allowing Delellis to identify him at trial.

### D. Because the jury never heard testimony regarding the other three out-of-court identifications, Perkins's motion to suppress them is moot.

Perkins argues that the district court erred by failing to re-open the evidentiary hearing as to certain search warrants, because the suggestiveness of the photo lineups called into question the probable

43

Case: 13-13444   Date Filed: 08/19/2014   Page: 59 of 92

cause underlying those warrants. (Def. Br. at 25,29.) Perkins, however, waived this argument below. In any event, the lineups were not unduly suggestive, the identifications were reliable, and the search warrants were based on ample other probable cause.

Perkins's problem here, as it is with his argument with respect to the motion to suppress evidence, is that he did not object to the R&R in this regard. While he did argue to re-open the hearing as to the search warrants in his post-hearing brief (Doc.92-7–8), nowhere in his objections did Perkins object to the denial of his request. (Doc.134.) For this reason, he waived appellate review. Fed. R. Crim. P. 59.

In any event, Perkins's argument fails. For the reasons detailed by the magistrate judge, and adopted by the district court, the photo lineups were not improperly suggestive, and the identifications were sufficiently reliable. (Doc.129-14–23.) Moreover, Perkins did not establish standing to challenge the warrants, and, even though the magistrate judge had no reason to review the probable cause, ample other evidence supports issuance of the search warrants even setting aside the out-of-court identifications. (Doc.109-24–25&n.8.) For example, the affidavit supporting the search of the Tampa bag contains extensive information that it contained contraband or evidence of a crime, irrespective of whether the bag belonged to Perkins. (Doc.109-24–25;Ex.14(Aff.¶¶5–12,14–23).) Similarly, the

affidavit for Gables apartment 1212 contained extensive information that the apartment housed contraband or evidence of a crime, regardless of the identity of its occupant. (*Id.*;Aff.¶¶41–47,51–66.) The evidence would not have been suppressed, in any event, under the good-faith exception. *U.S. v. Leon*, 468 U.S. 897, 104 S. Ct 3405 (1984). While on appeal Perkins cites to *Franks v. Delaware,* 438 U.S. 154, 98 S. Ct. 2674 (1978) (Def. Br. at 29), he made no *Franks* claim below. (Doc.92(not citing *Franks*);Doc.109-24n.7 (noting that Perkins did not raise a *Franks* claim).)

### 3.  The district court did not abuse its discretion by not recusing.

#### A. Perkins's *pro se* motion to recuse fails to satisfy the statutory requirements.

Perkins has accused the district judge of making certain inflammatory off-the-record remarks in lockup the morning of trial. (Def. Br. at 31;Doc.283-4¶¶20–22.) The record, however, shows that the district judge never made such remarks. Perkins alleges the court made those statements in front of government counsel, defense counsel, a court reporter, and a U.S. Marshal. Yet none of those officers of the court suggest the district judge made any such inflammatory remarks. The only allegation comes from Perkins's self-serving *pro se* pleading, 16 months after trial. In his jail calls, while Perkins recounted for his family the court's surprise visit, and proudly regaled them with his

gamesmanship, Perkins never mentioned the inflammatory comments he would later allege in the recusal motion. As the district court's order makes clear, the court never made the remarks Perkins alleges. (Doc.313-52–53.)

On appeal, for the first time Perkins argues that the district court was required under 28 U.S.C. § 144 to "proceed no further," and that another judge had to be assigned based on the allegations in his *pro se* motion. Plaintiff notably fails to provide any legal authority for his theory that recusal is automatic once a party files a recusal affidavit under Section 144. The Supreme Court has ruled that the district judge has the lawful authority to pass on the legal sufficiency of the affidavit. *Berger v. U.S.*, 255 U.S. 22, 30, 36, 41 S. Ct. 230, 232, 234 (1921).

In determining whether recusal is appropriate under Section 144, courts must determine whether three essential elements have been met: (1) whether the party has made and timely filed an affidavit; (2) whether the affidavit is accompanied by a good faith certificate of counsel; and (3) whether the affidavit is legally sufficient. *Parrish v. Bd. of Comm'rs of the Ala. State Bar*, 524 F.2d 98, 100 (5th Cir.1975) (en

Case: 13-13444 Document: 34 Date Filed: 08/29/2014 Page: 62 of 92

banc);[2] *Turner v. City of Fort Lauderdale*, No.05-61635-CIV, 2008 WL
2553311, *2 (S.D. Fla. June 20, 2008). To be timely, the affidavit must
be filed "not less than ten days before the beginning of the term at
which the proceeding is to be heard, or good cause shall be shown for
failure to file it within such time." 28 U.S.C. § 144.

   Because disqualification of a district judge disrupts and delays the
judicial process, recusal affidavits under Section 144 "are strictly
scrutinized for form, timeliness, and sufficiency." *U.S. v. Womack*, 454
F.2d 1337, 1341 (5th Cir.1972). It is the judge's duty to continue
presiding over the case where the showing for recusal is insufficient.
*Eisler v. U.S.*, 170 F.2d 273, 278 (D.C. Cir.1948) (citation omitted).
Courts should consider the "more technical" requirements of Section
144, including timeliness, before moving to the sufficiency of the bias
allegations. *U.S. v. Cerrella*, 529 F. Supp. 1373, 1377–78 (S.D. Fla.
1982).

   Perkins's motion fails to meet the requirements of Section 144. As
an initial matter, Perkins was represented by counsel, so his *pro se*
motion was improperly filed. Indeed, the district court previously

---

   [2] The Eleventh Circuit has adopted as precedent the decisions of
the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v.
City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

ordered Perkins to stop filing *pro se* motions while represented.
(Doc.130-1–2.)

Perkins did not timely file his motion for recusal. Perkins
submitted his recusal motion 16 months after trial when the district
judge allegedly made the statements on which the motion is based.
Perkins does not even attempt to excuse the untimeliness of his
motion, nor explain why, if such inflammatory statements were
uttered by the judge in his presence, he waited through trial, and
another 16 months, to request recusal.

Nor was Perkins's affidavit accompanied by the required good faith
certificate of counsel. Perkins acknowledges this failure in a footnote,
but tries to excuse its absence by arguing that he should have been
considered to be representing himself for purposes of the recusal
motion. (Def. Br. at 31n.6.) But Perkins never invoked his right to
self-representation. Perkins provides no authority excusing the good
faith certificate, nor explaining why he should be considered as
representing himself when convenient for him, but not otherwise.
The requirement of a good faith certificate of counsel is particularly
important in a case such as this one. Perkins's jail calls show his
attempts to use the Federal Rules to manipulate the court system and
prevent trial. Given Perkins's attempts to obstruct, his *pro se* affidavit
can hardly be taken at face value.

Case: 13-13444    Document: 34    Date Filed: 08/08/2014    Page: 64 of 92

**B. Because Perkins fails to show any external bias, the district court did not abuse its discretion by failing to recuse.**

In the alternative, Perkins argues for the first time on appeal that the district court should have *sua sponte* recused itself under 28 U.S.C. § 455(a). Where a defendant fails to seek recusal, review is only for plain error. *Berger*, 375 F.3d at 1227. Besides his self-serving accusations in his motion to recuse below, Perkins points to eight statements the district court made around the time of trial, describing her evaluation of the evidence, and demonstrating the judge's reaction to Perkins's obstreperous behavior. (Def. Br. at 33–34.) The district court did not abuse its discretion, nor plainly err, by not *sua sponte* recusing itself based on these remarks.

Based on the Supreme Court's extrajudicial-source doctrine, the district court did not plainly err by not recusing itself. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. U.S.*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994). The opinions expressed by the district judge about the evidence and Perkins's obstreperousness were based on the judicial proceedings. Accordingly, the underlying rationale for the extrajudicial-source doctrine — that proper performance of the judicial

function often, and necessarily, leads the judge to form opinions about the proceedings — would apply with full force. *See id.*, 510 U.S. at 550–552, 114 S. Ct. at 1555 (explaining that even though a judge "may, upon completion of the evidence, be exceedingly ill-disposed towards the defendant, who has been shown to be a thoroughly reprehensible person," the "judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task"). Perkins fails to point to any external source, outside of the facts and events of this case, supporting recusal. Accordingly, the district court did not plainly err by not *sua sponte* recusing.

**4. The district court did not plainly err in concluding that trial commenced in lockup, nor in finding that Perkins constructively waived his right to appear, and that he invited any error.**

Federal Rule of Criminal Procedure 43 requires a defendant's presence at every trial stage, but allows a "defendant who was initially present at trial" to waive the right to be present. Fed. R. Crim. P. 43(c)(1). Once trial has begun, a defendant's voluntary absence waives his right to be present. *Id.*; *Crosby v. U.S.*, 506 U.S. 255, 261–62, 113 S. Ct. 748, 752–53 (1993). Here, Perkins, in a pre-meditated plan, refused to leave Marshal's lockup the morning of trial. When the

50

Case: 13-13444    Document: 34    Date Filed: 08/19/2014    Page: 66 of 92

court visited him there and advised him of his right to be present in the courtroom, Perkins became disruptive and refused to respond to the court or leave lockup. Trial proceeded, with Perkins watching a live audio-video feed. The court provided Perkins with a pen and paper, encouraged defense counsel to visit Perkins during breaks, and told Perkins that he could appear in court whenever he wished. After the jury convicted, Perkins moved for a new trial, arguing that his absence violated Rule 43. The district court denied the motion, reasoning that trial began during the hearing in lockup, that Perkins constructively waived his right to be present, and that he invited any error.

The district court's interpretation of Rule 43 is reviewed *de novo*. *U.S. v. Sterling*, 738 F.3d 228, 234 (11th Cir.2013). The district court's factual finding that the defendant voluntary waived his presence at trial must be affirmed unless clearly erroneous. *Id.* This Court then "consider[s] whether the district court abused its discretion in concluding that there was on balance a controlling public interest to continue the trial in the defendant's absence." *Id.* (citing *U.S. v. Bradford*, 237 F.3d 1306, 1311 (11th Cir.2001). Even if the district court erred in the timing of defendant's waiver, the error may be harmless. *Id.* Where the defendant does not timely object, a district judge's decision to continue trial in his absence must be affirmed

51

unless it is plain error. *U.S. v. Martinez,* 604 F.2d 361, 365 (5th Cir.1979).

This Court must affirm based on this Court's controlling opinion in *U.S. v. Sterling,* 738 F.3d 228 (11th Cir.2013), a case that Perkins failed to cite. Sterling, a sovereign-citizen defendant, participated in pre-trial proceedings but on the morning of trial refused to leave Marshal's lockup. 738 F.3d at 233&n.1. He consented to a visit by the judge, but once the court was present Sterling refused to answer the court's questions, and repeated, "I do not understand what's going on. I do not accept no offers of the court." *Id.* at 233. The trial judge tried to advise him of his rights and told him that his absence would be deemed a waiver of his right to be present at trial. *Id.* Back at court, the trial judge found that Sterling waived his presence, which his attorney conceded. *Id.* The judge ensured Sterling could view the proceedings through a live video feed, and permitted his counsel to meet with him during breaks. *Id.*

On appeal, Sterling argued that the trial court violated Rule 43. *Id.* at 232. Sterling argued that trial began at jury selection, and so he was not present for its beginning, in violation of the rule. *Id.* at 236. This Court rejected Sterling's argument, the same argument which Perkins makes here. *Id.* In *Sterling,* this court held that "trial commences no later than on the day of jury selection, without respect to whether the

52

Case: 13-13444   Document: 34   Date Filed: 08/19/2014   Page: 68 of 92

defendant is present at the time prospective jurors enter the courtroom." *Id.* at 236. This Court also rejected Sterling's argument that "the district court was required to use a talismanic phrase that the trial was beginning." *Id.* Instead, "trial had commenced on the day of jury selection when court was held in the interview room, Sterling was informed of his rights, and the trial proceedings were explained." *Id.* "At that time," this Court held, "Sterling was permitted under Rule 43 to waive his right to be present." *Id.*

This Court went on to hold that Sterling's non-responsiveness acted as an effective waiver: "Sterling refused to respond to the court, and therefore the district court properly found that Sterling constructively waived his right to be present at trial." *Id.* at 236–37. The district court, in *Sterling*, appropriately balanced the public's interest with Sterling's right to be present, considering Sterling's disruptive behavior and the inconvenience to the jury and witnesses that would result from delay. *Id.* at 237. This Court concluded that given that Sterling's "absence was a result of [defendant's] own decision not to attend rather than the result of external circumstances ... there was no reason to believe that the trial could have soon taken place with [the defendant] present." *Id.* at 237 (quoting *Bradford*, 237 F.3d at 1314). Thus, the district court permissibly concluded that "the public interest in proceeding with trial outweighed any interest in

Case: 13-13444 Document: 34 Date Filed: 08/19/2014 Page: 69 of 92

delay," and the district court permissibly chose to continue trial without Sterling. *Id.* at 237.

So, too, here. Like Sterling, Perkins attended pretrial hearings, even though Perkins was regularly disruptive. For example, at the evidentiary hearing on Perkins's motions to suppress, Perkins tried to interrupt the proceedings with sovereign-citizen pronouncements, and tried to delay them by requesting bathroom breaks every hour. (Doc.83-129–132;Doc.313-5–6.) At the pretrial conference held the Friday before trial, Perkins was even more disruptive, so much so that the district court met separately with counsel to discuss how to proceed if it needed to remove Perkins from the courtroom during trial. (Doc.313-7–11.)

Then, the morning of trial Perkins refused to appear, and threatened the deputies if they tried to bring him to court. So the district judge brought trial to Perkins. Despite the court's efforts to advise Perkins of his rights, Perkins was non-responsive, repeating, "I do not understand. I do not agree." Jail recordings show that this was all a tactic, and part of Perkins's strategy to avoid trial. Back in the courtroom, the district judge repeated the advice of rights, so that Perkins could hear them over the live feed. She told him that he was welcome to trial at any time, and instructed the Marshals to alert her if Perkins raised his hand and wished to attend. The district judge

provided Perkins with a pen and paper so that he could take notes and participate. She told him that she would ask his counsel to visit him to consult, and encouraged counsel to do so during breaks. All told, the measures here exceeded those in *Sterling*.

After the verdict, Perkins moved for a new trial making the same arguments as Sterling. The district court did not abuse its discretion, much less plainly err, by denying that motion. This Court's holding in *Sterling* confirms that, as the district court concluded, trial commenced the day of jury selection, by the time the district court met Perkins in his cell. This Court's holding in *Sterling* also confirms the district court's ruling that Perkins's obstructive behavior and non-responsiveness waived his right to appear at trial. As in *Sterling*, the public interest favored proceeding with trial, as Perkins showed no indication that he would appear, and the jury and witnesses were already assembled. On appeal, for the first time Perkins argues that the district court made no finding as to the public interest. But during trial the prosecutor specifically argued that the public interest favored proceeding, noting the 20–25 witnesses, some flown in from out of state. (Doc.237-66–67.) The district court agreed. (Doc.237-68–69,71.) Perkins notes on appeal that the district court did not call the case when in lockup, nor explicitly state that the trial was beginning there. (Def. Br. at 36.) But *Sterling* confirms that there are no talismanic

words the district court must utter to commence trial. 738 F.3d at 286. As this Court made clear in *Sterling*, what is important is that the defendant was present the day of trial, that the court explained his rights to him, and that the he constructively waived them such that the public interest favored proceeding.

On appeal, Perkins takes issue with the district court's finding that Perkins invited the error, and that Perkins and his counsel did not object to the procedure followed in the district court. (Def. Br. at 46.) According to Perkins, both he and his attorney objected to the trial being held in his absence. *Id.* Not so. Defense counsel never raised an objection to Perkins's absence, and did not contemporaneously object to the procedures followed by the court. The next day, after jury selection, defense counsel relayed that Perkins "would prefer [the district court] stop the trial." (Doc.236-59.) No doubt true. In fact, as the jail recordings confirm, stopping trial was the whole point of Perkins's subterfuge. Nevertheless, there was no Rule 43 objection at trial, and the district court did not clearly err, much less plainly err, in finding that by refusing to leave lockup, Perkins constructively waived his appearance and invited any potential error.

Next, Perkins complains that he was tricked into appearing in the meeting room at lockup where the district judge appeared. While this differs from Sterling, who consented to meeting the judge at lockup, it

56

is a distinction without a difference. This Court based its holding in
*Sterling* on Sterling's presence in lockup the day of trial, the district
court's advising him there of his rights, and Sterling's non-
responsiveness effecting a constructive waiver. The same holds true
here. Nothing in *Sterling* was based on Sterling's consenting to seeing
the judge in lockup, nor on the attorney's concession that Sterling was
waiving his right to attend trial. In fact, here, during trial, defense
counsel conceded: "I don't think having him forced to court and
having extra security, I think that's going to prejudice him more than
not being here." (Doc.238-291.)

Finally, the timing of the waiver, even if erroneous, which it was
not, was harmless. Perkins concedes that any Rule 43 error would be
governed by harmless error analysis. (Def. Br. at 34.) He argues that
his counsel was not prepared to represent his interests at trial and that
his presence at trial would have been helpful; therefore, he claims, the
purported Rule 43 error was not harmless. (Def. Br. at 40.) But the
reason counsel claimed to be unprepared was that Perkins refused to
discuss the case with him. (Doc.237-67.) And whether Perkins could
have been helpful had he chosen to attend trial misses the point.
Perkins had every opportunity to assist and to attend trial, but
refused. Regardless of the procedure the district court followed, there
is no reason to believe Perkins would have changed course,

particularly since this was part of a calculated strategy. Regardless of
any technical violation of Rule 43, nothing would have changed. Any
purported Rule 43 error was harmless.

**5. Perkins invited any denial of his right to public trial, and in any
case the district court did not plainly err by commencing trial in
lockup when Perkins refused to appear.**

Perkins argues that the hearing at lockup violated his right to public
trial. But because it was Perkins who refused to appear publicly, he
invited any purported error, and his claim fails. *Brannan*, 562 F.3d at
1306.

If the invited error doctrine does not apply, plain error review
does. S*ee U.S. v. Bucci*, 525 F.3d 116, 129 (1st Cir.2008) (reviewing for
plain error the denial of public trial, where defendant failed to object
at trial). Neither Perkins nor his counsel objected to a denial of public
trial. When Perkins surprised everyone by refusing to appear the
morning of trial, the district court discussed with counsel how to
proceed. (Doc.236-2-48.) At no time did counsel suggest that meeting
with Perkins in lockup violated a right to public trial. Nor did Perkins
voice this objection. Later, Perkins's counsel filed a motion for new
trial, but in that motion did not argue that Perkins was deprived a
public trial. (Doc.190.) During the sentencing hearing counsel sought
to add this ground to the new trial motion, but counsel never
developed the argument. (Doc.326-62–63.) Regardless of whether he

properly raised it in his new trial motion, Perkins did not contemporaneously object to a denial of public trial, so review is only for plain error. *U.S. v. Rodriguez,* 627 F.3d 1372, 1379 (11th Cir.2010).

The district court did not err, much less plainly err, by bringing trial to Perkins when Perkins refused to leave Marshal's lockup. The district court did not close the proceedings. To the contrary, as the district court noted when counsel raised the issue during sentencing, "We would have let anybody come that could have fit in the room. You know, we weren't keeping them out." (Doc.326-63.) And while the district court sought to limit the attorneys and court personnel in lockup — stating that it wanted "as few people as possible" at the meeting room, it did so for legitimate logistical and safety reasons. (Def. Br at 52.) Moreover, to the extent attendance was limited by holding the hearing at lockup, that was due to Perkins's calculated refusal to appear publicly. By refusing to leave lockup in an effort to avoid the commencement of trial, Perkins constructively waived his right to public trial. *U.S. v. Hitt,* 473 F.3d 146, 155 (5th Cir.2006) ("Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to public trial"). Courts also have the authority to limit public access if a greater interest is served. *Judd v. Haley,* 250 F.3d 1308, 1314 (11th Cir.2001).

Case: 13-13444 Document: 34 Date Filed: 08/19/2014 Page: 75 of 92

Moreover, any error would not be plain. Perkins cites no statute or controlling authority holding that the district court cannot commence trial in lockup when the defendant refuses to leave. *Lejarde-Rada*, 319 F.3d at 1291. In fact, this Court's holding in *Sterling* expressly permits the procedure followed by the district court here. 738 F.3d at 234–37. Far from being plain error, the procedure followed by the district court is blessed by controlling authority.

Perkins chose not to appear publicly for trial. He cannot now complain that the district court held a hearing without him where it was his decision not to appear. Perkins invited any error, and the district court did not plainly err in any case. To hold otherwise would be to encourage defendants to refuse to appear publicly for trial. This cannot be the law.

## 6. The evidence was sufficient to support conviction.

Perkins argues that the evidence was insufficient to convict because no one identified him as the perpetrator at trial. He also argues that his aggravated identity theft conviction should be overturned because the evidence was not sufficient to establish that: (1) 1212 Gables was his apartment; and (2) he knew Lisa Evans was an actual person. Each argument fails.

Case: 13-13444    Document: 34    Date Filed: 08/19/2014    Page: 76 of 92

### A. Sufficient evidence proved identity.

For the first time Perkins claims that insufficient evidence proved his identity. Review is therefore limited to manifest miscarriage of justice. *U.S. v. Houser*, — F.3d —, 2014 WL 2767200, at *11 (11th Cir.2014).

Ample evidence proved that Perkins was the person who committed the charged offenses. To begin, during jury selection, the prospective jurors were shown a picture of Perkins to see if anyone knew him. (Doc.237-7-8.) Then, the court asked the parties how, given that Perkins refused to come to court, they wanted to address the question of whether the defendant on trial was the person that the witnesses would refer to in their testimony. (Doc.237-126-130.) Defense counsel suggested that the witnesses be shown the same picture that the prospective jury was shown during voir dire. (*Id.*) The picture was shown to each witness as follows:

- the FBI agent who had numerous undercover conversations with Perkins, identified the person in the picture as the person who he met at the Atlanta Ruby Tuesdays and who passed him a dozen fraudulent cards immediately prior to arrest. (Doc.237-197-98;Gov't Ex.177.);

- the FBI agent who arrested Perkins identified the person in the picture as the same individual he arrested and the same person that he had seen in another court proceeding in this case. (Doc.238-319-20;Gov't Ex.177.);

61

- the Suntrust insiders identified the person in the photograph as the same person who they gave insider information to. (Doc.238-412,447;Gov't Ex.177.);

- co-defendant Sorden identified the person in the picture as the person with whom he conducted fraud. (Doc.238-593;Gov't Ex.177.);

.

- Delellis identified the person in the picture as the person who returned to his restaurant in Tampa looking for the bag he left. (Doc.238-348;Gov't Ex.177.) Delellis also identified the person in the picture as the same person he saw at a prior court hearing in this case. (*Id.*); and

- the picture that all of these witnesses identified matched the picture on two driver's licenses that Perkins possessed when he was arrested, one of which was in his own name and the other was in the name of Daniel J. Mathews. (Gov't Ex.177,14,15;Doc.237-226-27.)

And notably, during the jury charge conference, defense counsel indicated that identification would not be an issue. (Doc.281-745) ("You don't have to worry about me arguing anything about [Perkins] not being here or any identification issues in that regard.") Finally, when a deputy raised the possibility of bringing Perkins to court, defense counsel rejected that proposal, noting that to do so would "prejudice" Perkins. (Doc.238-291.) Any error in this regard, then, was invited. Far from a miscarriage of justice, the identification evidence amply supported conviction.

### B. Sufficient evidence supports the inference that the Gables apartment was Perkins's.

During his Rule 29 motion, Perkins's counsel argued that multiple people had access to 1212 Gables. (Doc.239-730.) But counsel never argued that insufficient evidence supported the conclusion that 1212 Gables was Perkins's apartment. (*Id.*) Accordingly, this argument on appeal is reviewed only for a miscarriage of justice.

The evidence established that 1212 Gables was Perkins's apartment. First, co-defendant Sorden testified that 1212 Gables was Perkins's apartment, and that Perkins stayed there with his girlfriend. That testimony was corroborated in several ways. Despite being rented in a woman's name, the apartment's one bedroom contained only men's clothing. Inside the apartment was Perkins's Louisiana birth certificate. Other than a blank birth certificate, Perkins's was the only birth certificate in the apartment.

In addition, the apartment contained items Perkins described to the undercover agent. For example, Perkins told the agent that he had a MSR206 card writer; the apartment contained a MSR206 connected to a computer using a serial-to-USB connector just as Perkins described. When agents searched the apartment promptly on Perkins's arrest, that computer had a USB thumb drive connected which contained credit card account information corresponding to the fraudulent credit cards Perkins handed to the undercover agent.

Perkins also told the agent that he used fraudulent credit cards to purchase certain photo equipment. Perkins had receipts for that equipment on him when he was arrested. And neatly stacked in the closets was that same photo equipment, with boxes containing serial numbers matching the receipts in Perkins's pockets. Perkins told the undercover agent that he had a source in Ukraine for fraudulent credit card information. After Perkins's arrest, FBI agents found receipts for wire transfers to the Ukraine both in Perkins's car and in the apartment.

Next, Perkins told a confidential informant that he kept cash in a shoebox. When searching 1212 Gables, agents found $2,700 in a shoe. (Doc.239-661.) They also found an ASCAP application in Perkins's name, a lease to his previous apartment, a Sam's Club card with his photo, and a photo album with pictures of Perkins.

Finally, Perkins had a two driver's licenses in different names and 20 fraudulent credit cards on him when arrested. The apartment contained not only the MSR206 card writer, but devices which could be used to create false state identifications. Thus, far from a miscarriage of justice, the evidence supported the inference that 1212 Gables was indeed Perkins's apartment.

64

### C. Sufficient evidence supports the inference that Perkins knew the identity of an actual person was used to rent 1212 Gables.

Perkins argues that there was insufficient evidence to show that Perkins knew Lisa Evans was a real person. Perkins's argument fails.

The government may rely on circumstantial evidence to show that an aggravated identity theft defendant knew that the victim was an actual person. *U.S. v. Gomez-Castro*, 605 F.3d 1245, 1249 (11th Cir.2010). Here, direct evidence showed that Lisa Evans's identity was stolen and fraudulently used to rent the 1212 Gables apartment where Perkins conducted his frauds, kept evidence of his frauds, and stored the fruits of it. Lisa Evans testified that she never sought to rent an Atlanta apartment, and while her name, date of birth, and social security were accurately placed on the rental application, the driver's license that was used as part of that application has a picture of a different person. The fake driver's license purports to be from Ohio. Inside Perkins's apartment was equipment that could be used to manufacture fake state identifications, as well as a fake Ohio driver's license with Perkins's picture, and a number of other fake Ohio driver's licenses, supporting the inference that Perkins manufactured the fake Lisa Evans driver's license.

Agents recovered mail in the apartment from the Gables apartment complex addressed to Lisa Evans at that address, as well as correspondence relating to renter's insurance. Surely Perkins, the

65

Case: 13-13444    Document: 34    Date Filed: 09/19/2014    Page: 81 of 92

occupant of the apartment, was aware the apartment was rented in the name of Evans, for whom he manufactured a fake driver's license. Perkins also had to know Evans was an actual person with an actual social security number. In order to rent the apartment, the fake Lisa Evans had to provide not only a name, but a corresponding date of birth and social security number, both of which actually belonged to Evans. (Gov't Ex.115-1–8,75.) As is typical, the apartment complex ran credit and background checks verifying this information before renting the apartment. (Gov't Ex.115-6–18.)

In *U.S. v. Holmes,* this Court concluded that a reasonable juror could have found beyond a reasonable doubt that the social security number belonged to a real person when the defendant used the numbers to obtain a passport, a driver's license, and a line of credit. 595 F.3d 1255, 1258 (11th Cir.2010.) So, too, here. Perkins's use of Evans's correct date of birth and social security number on the apartment application and on the fake state driver's license he manufactured support the inference that Perkins knew Evans was an actual person, so that the apartment application would be approved.

Case: 13-13444    Date Filed: 08/19/2014    Page: 82 of 92

**7. The district court did not clearly err by applying an enhancement for obstruction of justice, did not err by imposing sentence for aggravated identity theft, nor did it abuse its discretion by imposing a below-Guidelines 360-month sentence.**

Perkins argues that he should not have received a Guidelines enhancement for obstruction of justice, nor the two-year consecutive sentence for aggravated identity theft. He also argues that his 360-month sentence was substantively unreasonable. Perkins's claims fail.

**A. The district court did not clearly err in finding that Perkins's manipulative efforts to sabotage trial were an attempt to obstruct justice, and any error was harmless.**

Section 3C1.1 of the Guidelines provides for a two-level enhancement:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

USSG § 3C1.1. The enhancement applies where a defendant "willfully fail[s] to appear, as ordered, for a judicial proceeding." *Id.*, cmt. n.4(E).

Perkins's behavior falls squarely under this plain language. Perkins refused to appear at trial and at sentencing. And jail recordings show

67

that Perkins willfully failed to appear so as to manipulate the court proceedings in an effort to avoid trial.

Nor was his willful absence Perkins's only attempt to obstruct. Perkins caused counsel to file several motions to withdraw. Perkins himself made numerous *pro se* filings, even after being ordered to desist, seeking to discharge counsel. Yet during hearings, Perkins refused to respond to the court's questions regarding his representation. Perkins refused to cooperate with appointed counsel, refused to waive counsel, and if he was able, did not retain counsel.

Perkins claims that he was merely exercising his constitutional rights. But there is no constitutional right to sabotage trial. Nor is there any merit to Perkins's claim that he merely sought to exercise his right to retain counsel of his choosing. Jail recordings confirm that Perkins interest was in stymying the justice system, not in exercising any bona fide constitutional right.

Finally, any error was harmless. The district court made clear that it would impose the same 360-month total sentence regardless of the Guidelines calculations. Because that sentence was substantively reasonable, any procedural error was harmless. *U.S. v. Keene,* 470 F.3d 1347, 1348–49 (11th Cir.2006) (harmless error if district court would have imposed the same sentence and that sentence is substantively reasonable).

Case: 13-13444 Date Filed: 08/08/2014 Page: 84 of 92

### B. The district court did not err by imposing punishment for aggravated identity theft.

For the same reasons Perkins raises in arguing the sufficiency of the evidence, Perkins claims that he should not have been sentenced to the two-year consecutive term for aggravated identity theft. Because, as discussed above, the evidence was sufficient to support Perkins's aggravated identity theft conviction, his argument fails.

### C. The district court did not abuse its discretion by imposing a 360-month sentence, considering the complexity of Perkins's numerous frauds, his manipulation of the justice system, and his profoundly manifest recidivism.

The district court did not abuse its discretion by imposing a 360-month total sentence. As an initial matter, the district court imposed a sentence well-below the 1,012-year statutory maximum sentence, indicating that the 360-month sentence is reasonable. (PSR-45); *U.S. v. Valnor,* 451 F.3d 744, 751–52 (11th Cir.2006). Next, the district judge calculated the Guidelines giving substantial benefits to Perkins. For example, the district court did not use the $500-per-credit-card loss amount required by the Guidelines, nor did she assess a two-level enhancement for Perkins's possession of device making equipment, even though counsel did not object to the latter. (Doc.326-29–45.) Had the district judge applied the Guidelines literally, Perkins would have faced a range of Life plus 24 months. (PSR-45;Doc.326-44.) Instead, the district court downgraded the intended loss amounts

69

from the Suntrust fraud, discounting the loss intended to the Georgia Tech Foundation and other potential victims. (Doc.326-40–43.) Overall, the district court charitably calculated Perkins's Guideline range as 360-months-to-life, plus 24 months for aggravated identity theft. The district judge then concurred with the government's recommendation to vary still downward, to a total sentence of 360 months. Although there is no legal presumption, this Court "ordinarily ... expect[s] a sentence within the Guideline range to be reasonable." *U.S. v. Talley*, 431 F.3d 784 (11th Cir.2005). Because the district court downwardly varied, this Court can expect that the sentence was not unreasonably high.

The Section 3553(a) factors support the sentence. As the district judge observed, Perkins's crimes were some of the most extensive she had seen. (Doc.326-59.) Perkins sought millions of dollars at a time from innocent businesses, and manipulated insiders at banks to give him confidential information. On arrest, he possessed over 100,000 stolen credit card numbers, and the record shows that he used these numbers to purchase luxury goods for himself, such as a Cadillac Escalade and professional digital camera equipment, as well as to barter for inside bank information from the undercover agent. Perkins's crimes were substantial.

Perkins was also amongst the most unrepentant defendants prosecuted in this district. (Doc.326-59.) Perkins took the resistant sovereign-citizen strategy to new levels, planning with his family how to manipulate the court system to avoid punishment. Despite overwhelming evidence against him, Perkins showed no remorse. His reaction included threatening liens against his own court-appointed attorney.

Perkins's criminal history is deplorable. He was arrested 19 times between the ages of 7 and 14. His adult record includes possession of crack and another federal fraud conviction, in total earning him a criminal history category of IV.

Perkins argues that he had a troubled youth, and has a history of mental health issues. Regarding his recalcitrance, Perkins argues that he merely sought to exercise his constitutional right to receive proper representation. As discussed above, the last point is bogus. Perkins never hired counsel, and refused to address the court when asked about representation. There is no constitutional right to avoid trial.

Perkins made each of these three arguments at sentencing. In essence, he wishes the Section 3553(a) factors be re-weighed more in his favor. But "[t]he weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court," and this Court will not remand for resentencing unless it is "left with

71

Case: 13-13444  Date Filed: 08/19/2014  Page: 87 of 92

the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors." *U.S. v. Clay*, 483 F.3d 739, 743 (11th Cir.2007) (quotation marks and citation omitted). Perkins has not carried his burden of showing such a clear error in judgment in this case.

### 8. No competency hearing was warranted.

#### A. The district court did not abuse its discretion by failing to order a competency hearing *sua sponte*.

Perkins argues that his procedural due process rights were violated by the district court not *sua sponte* ordering a competency hearing. "A district court is required to order a hearing *sua sponte* if it has reasonable cause to believe that a criminal defendant is mentally incompetent." *U.S. v. Lindsey*, 339 F. App'x 956, 957–58 (11th Cir.2009); 18 U.S.C. § 4241(a). *See also* 18 U.S.C. § 4244(a). The district court did not abuse its discretion by failing to order Perkins undergo a competency hearing.

Perkins claims there was reasonable cause for the district court to order a competency hearing based on Perkins's relationship with his appointed counsels, his rantings during court hearings, and his refusal to appear for trial. (Def. Br. at 52–53,56.) The district court, however, noted that Perkins's behavior was consistent with the calculated sovereign-citizen strategy it had seen in other cases. (Doc.237-74.)

While the district court noted that Perkins's behavior may seem irrational or crazy to a lay person, the district court had no concerns about his competency, recognizing that Perkins was strategically trying to manipulate the court system. (*Id.*) The district court did not abuse its discretion in this regard. Indeed, the jail calls confirm that Perkins was lucid, intelligent, and rational, and that his behavior was calculated to disrupt the proceedings. There was no abuse of discretion. To hold otherwise would be to require a competency hearing for every defendant who employs sovereign-citizen tactics, resulting in unwarranted delay.

### B. The district court did not clearly err in finding that Perkins was competent, thus denying Perkins's tardy request for a competency hearing.

This Court ordinarily reviews a district court's determination that a defendant is competent to stand trial for clear error. *Ferguson v. Sec'y for Dep't of Corrections*, 580 F.3d 1183, 1221 (11th Cir.2009). Given that Perkins refused to meet with his attorney and did not receive the PSR prior to sentencing, the district court delayed finalizing its sentence and entering its judgment and commitment order to allow time for Perkins, if he so chose, to review the PSR, file objections, and otherwise better participate in sentencing. (Doc.326-5–6,62,68.) Perkins never did. But after the sentencing hearing and before the judgment and commitment was filed, Perkins's counsel filed a motion

73

Case: 13-13444    Document: 34    Date Filed: 08/29/2014    Page: 89 of 92

for competency hearing. (Doc.307.) According to counsel, another client at the jail told him that Perkins "seemed crazy," and one of Perkins's childhood friends raised concerns about Perkins's competency. (Doc.307-1–2.) The childhood friend noted that Perkins had been prescribed certain serious mental health medicines. (Doc.307-2.) Finally, a prior PSR noted that Perkins had previously been diagnosed with schizoaffective disorder. (Doc.307-3;PSR-40.)

   The district court did not clearly err in finding that Perkins was competent to stand trial, nor did it err by denying the tardy motion. Section 4244(a) requires the defense to file a motion for competency hearing "within ten days after the defendant is found guilty." 18 U.S.C. § 4244(a). Here, the defense's motion was filed years after trial. Also, as counsel acknowledged, the defense's motion was based on rank hearsay. (Doc.307-3n.5.) The district court saw that, contrary to being irrational or incompetent, Perkins was employing a manipulative obstructionist tactic at trial. And the jail calls confirmed that Perkins was not incompetent, but was intelligent, rational, and articulate. Perkins carried out a series of complex frauds, further supporting the district court's factual finding that Perkins was competent to stand trial. *See U.S. v. Ramirez*, 491 F. App'x 65, 71 (11th Cir.2012) (affirming the district court's failure to conduct a competency hearing where the defendant asserted sovereign-citizen

74

tactics, and noting that "the assertion of a ludicrous legal argument by a defendant does not evince mental incompetence sufficient to preclude the government from prosecuting"); *U.S. v. Jonassen*, __ F.3d __, 2014 WL 3455308, at *6 (7th Cir. July 16, 2014) (affirming the district court's refusal to hold a competency hearing where the defendant asserted a sovereign-citizen defense); *U.S. v. Brown*, 669 F.3d 10, 18 (1st Cir.2012) (same). Finally, previous medication with anti-psychotic drugs does not render a defendant incompetent per se. *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir.1995).

Finally, Perkins claims that he was incompetent during trial, and thus was deprived his right to substantive due process. (Def. Br. at 57-58.) Perkins concedes that he would only be entitled to a competency hearing had he presented "clear and convincing evidence [raising] a substantial doubt" as to his competency to stand trial. (Def. Br. at 57, *quoting and citing James v. Singletary*, 957 F.2d 1562, 1572 (11th Cir.1992.)) There is no such evidence here.

As the district court found, Perkins's tactics were merely a more aggressive version of the sovereign-citizen strategy certain prisoners have recently employed in the Northern District of Georgia. (Doc.313-5.) The district court entertained no substantial doubt that Perkins was competent; rather, Perkins merely wished to impeded and delay the proceedings. (Doc.237-74.) Perkins's conduct in court during

75

Case: 13-13444 Document: 34 Date Filed: 08/13/2014 Page: 91 of 92

pretrial hearings, his rational behavior while committing the charged crimes, and his recorded jail calls supported the district court's finding that Perkins had the ability "to engage in meaningful participation in the proceedings against him." *Lindsey,* 339 F. App'x at 962. He merely chose not to.

## CONCLUSION

This is not a case about a defendant trying to exercise his constitutional rights. Rather, Perkins seeks to manipulate the justice system in an effort to avoid punishment for his crimes. A reversal would mean that defendants could indeed avoid trial, and skirt punishment, by refusing to appear. This Court should affirm.

Respectfully submitted,

SALLY QUILLIAN YATES
*United States Attorney*

LAWRENCE R. SOMMERFELD
*Assistant United States Attorney*

Case: 13-13444    Document: 34    Date Filed: 08/08/2014    Page: 92 of 92

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 word processing software in 14-point Goudy Old Style.

The instant brief currently contains 15,900 words, according to the word processing software, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The Government filed a "Motion to Enlarge Page Limit," along with the instant brief.

Today, this brief was uploaded to the Court's website and a copy was sent by first class mail, postage prepaid, to:

> SARALIENE SMITH DURRETT, ESQ.
> 2002 Summit Boulevard
> Suite 300
> Atlanta, GA 30319

August 7, 2014

_____

LAWRENCE R. SOMMERFELD
*Assistant United States Attorney*